Barry I. Levy, Esq.
Michael Vanunu, Esq.
Philip P. Nash, Esq.
Jaana Singh, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Company,
GEICO Indemnity Company, GEICO General Insurance Company
and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY and              Docket No.:_____ (      )
GEICO CASUALTY COMPANY,

                                   Plaintiffs,

                                                                  **Plaintiff Demands a Trial by
                  -against-                                       Jury**

RAPID MEDICAL SUPPLY DELIVERY, INC., MED
SUPPLY DELIVERY SERVICE, INC., MED CARE
SUPPLY DELIVERY, INC., LD HEALTH SUPPLY,
INC., ASSEL DARIBAYEVA, AIYM ASSIMKANOVA,
ANDREI MATEEV and JOHN DOE DEFENDANTS "1"
through "10",

                                   Defendants.
-------------------------------------------------------------------X

## <u>COMPLAINT</u>

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO

General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against LD Health Supply, Inc., Rapid Medical Supply

Delivery, Inc., Med Supply Delivery Service, Inc., Med Care Supply Delivery, Inc., Assel

Dariabayeva, Aiym Assimkoanova, Andrei Mateev (collectively, the "Defendants"), and John Doe

Defendants "1" through "10" (the "John Doe Defendants") hereby allege as follows:

**INTRODUCTION**

1.      GEICO brings this action to recover more than $940,000.00 that Defendants have wrongfully obtained from GEICO through the submission of thousands of fraudulent No-Fault insurance claims relating to medically unnecessary, illusory, and otherwise non-reimbursable durable medical equipment ("DME") and orthotic devices ("OD") (e.g. cervical collars, positioning cushions, lumbar sacral supports, shoulder supports, knee braces, infrared heat lamps, personal massagers, hydrotherapy whirlpools, etc.) (collectively, the "Fraudulent Equipment") through four DME companies: LD Health Supply, Inc. ("LD Health Supply"), Rapid Medical Supply Delivery, Inc. ("Rapid Supply"), Med Supply Delivery Service, Inc. ("Med Supply Delivery"), and Med Care Supply Delivery, Inc. ("Med Care Supply") (collectively, the "DME Providers").

2.      The DME Providers are all New York corporations that have in a concurrent and consecutive manner dispensed DME and OD to persons who were allegedly involved and injured in automobile accidents and were entitled for coverage under No-Fault insurance policies issued by GEICO ("Insureds") as part of a "quick hit" scheme to submit a large volume of billing to GEICO and other New York automobile insurance companies for Fraudulent Equipment.

3.      While the DME Providers are owned on paper by Assel Dariabayeva ("Dariabayeva"), Aiym Assimkoanova ("Assimkoanova"), and Andrei Mateev ("Mateev") (collectively, the "Paper Owner Defendants"), at all times they actually were operated and controlled by others not presently identifiable to GEICO.

4.      The Defendants, in conjunction with others not presently identifiable to GEICO, devised a fraudulent scheme that involved (i) associating and colluding with the layperson

operators and managers (the "Clinic Controllers") of various No-Fault medical clinics (the "Clinics"), (ii) obtaining prescriptions through the payment of kickbacks and other financial incentives for medically unnecessary DME/OD purportedly issued by healthcare providers (the "Referring Providers") who were working out of Clinics in the New York metropolitan area, and (iii) using these prescriptions for medically unnecessary DME/OD to submit billing to GEICO and the New York automobile industry with each DME Provider making common fraudulent misrepresentations regarding the type and nature of the Fraudulent Equipment in order to inflate the charges to GEICO and maximize Defendants' ill-gotten gains. Through the fraudulent scheme, Defendants billed GEICO alone for more than $1.7 million in a year and a half of billing. As part of their scheme to extract money from GEICO and avoid detection, Defendants shifted the billing submitted to GEICO from one DME Provider to the next from February 2024 through August 2025 and continue to seek collections on the fraudulent billing through today.

5.      GEICO seeks to terminate this fraudulent scheme and recover more than $940,000.00 that has been wrongfully obtained by the Defendants since 2024, and further seeks a declaration that it is not legally obligated to pay reimbursements of more than $470,000.00 in pending No-Fault insurance claims that have been submitted by or on behalf of the DME Providers since 2024 because:

     (i)      The Defendants billed GEICO for Fraudulent Equipment pursuant to a fraudulent scheme that was designed and implemented to exploit Insureds for financial gain so as to benefit the Defendants and others not presently known (i.e. the John Doe Defendants), without regard for genuine patient care and which included dispensing Fraudulent Equipment that was not medically necessary and which was prescribed pursuant to predetermined fraudulent protocols, including prescriptions issued and secured through collusive arrangements;

     (ii)      The Defendants billed GEICO for Fraudulent Equipment that was provided – to the extent actually provided – as a result of decisions made by laypersons, not based upon prescriptions issued by the Referring Providers who are licensed to issue such prescriptions;

(iii)    To the extent that any Fraudulent Equipment was provided to Insureds, the bills for the Fraudulent Equipment submitted to GEICO by the Defendants fraudulently misrepresented the type and nature of the Fraudulent Equipment purportedly provided to Insureds in order to fraudulently inflate the reimbursement rate for the Fraudulent Equipment, as the Healthcare Common Procedure Coding System ("HCPCS") Codes identified in the bills did not accurately represent what was provided to Insureds;

(iv)    To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted to GEICO by Defendants fraudulently and grossly inflated the permissible reimbursement rate that Defendants could have received for the Fraudulent Equipment; and

(v)    The Defendants billed GEICO for Fraudulent Equipment when they were not entitled to collect No-Fault Benefits because they failed to comply with local licensing requirements.

6.    The Defendants fall into the following categories:

(i)    The DME Providers are New York companies that are used as the billing arm of the fraudulent scheme – they purport to provide Fraudulent Equipment to persons who were allegedly injured in motor vehicle accidents, and bill New York automobile insurance companies, including GEICO;

(ii)    Defendant Dariabayeva is one of the primary drivers of the fraudulent scheme – she is listed on paper as the owner, operator, and controller of LD Health Supply and Med Supply Delivery, when, as discussed below, Dariabayeva works for one of the John Doe Defendants who secretly operated, managed, controlled and financially benefited from all the DME Providers, and used LD Health Supply and Med Supply Delivery to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims;

(iii)    Defendant Assimkoanova is also one of the primary drivers of the fraudulent scheme – she listed on paper as the owner, operator, and controller of Med Care Supply, when, as discussed below, Assimkoanova works for one of the John Doe Defendants who secretly operated, managed controlled and financially benefited from all the DME Providers, and used Med Care Supply to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims;

(iv)    Defendant Mateev is another of the primary drivers of the fraudulent scheme – he is listed on paper as the owner, operator, and controller of Rapid Supply, when, as discussed below, Mateev works for one of the John

Doe Defendants who secretly operated, managed controlled and financially benefited from all the DME Providers, and used Rapid Supply to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident

(v)     The John Doe Defendants are the other individuals involved in the fraudulent scheme – while they are presently not identifiable they include the person(s) secretly controlling and profiting from the DME Providers and the Clinic Controllers who are associated with the Clinics and have colluded with Defendants to further drive and financially benefit from the common fraudulent scheme committed against GEICO and other New York automobile insurers through their associations with the Referring Providers and control of the Clinics.

7.      As discussed below, Defendants have always known that the claims for Fraudulent Equipment submitted to GEICO were fraudulent because: (i) the billing submitted to GEICO and other New York automobile insurers was pursuant to a fraudulent scheme that was designed and implemented to exploit Insureds for financial gain so as to benefit the Defendants and others not presently known (i.e. the John Doe Defendants), without regard for genuine patient care, and which included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, including prescriptions secured through collusive arrangements; (ii) the Fraudulent Equipment was provided as a result of decisions made by laypersons, not based upon prescriptions issued by healthcare providers who are licensed to issue such prescriptions; (iii) the bills fraudulently misrepresented the type and nature of the Fraudulent Equipment purportedly provided to the Insureds; (iv) the charges were intentionally inflated based upon an exploitation of the payment formulas set forth in New York's "No-Fault" laws; and (v) the bills for Fraudulent Equipment submitted by Defendants to GEICO fraudulently misrepresented that Defendants complied with all local licensing requirements when Defendants were not lawfully licensed to provide the Fraudulent Equipment by the New York City Department of Consumer and Worker Protection (formerly Department of Consumer Affairs), as they either misrepresented the ownership interests for each of the DME Providers or failed to ever obtain a

license.

8.     As such, Defendants do not now have – and never had – any right to be compensated for the Fraudulent Equipment billed to GEICO through the DME Providers.

9.     The charts attached hereto as Exhibits "1" through "4," set forth a representative sample of the fraudulent claims that have been identified to date that were submitted, or caused to be submitted, to GEICO pursuant to Defendants' fraudulent scheme through LD Health Supply, Rapid Supply, Med Care Supply, and Med Supply Delivery.

10.    The Defendants' fraudulent scheme against GEICO and the New York automobile insurance industry began no later than February 2024 and has continued uninterrupted through the present day, as Defendants continue to seek collection from GEICO on pending charges for the Fraudulent Equipment.

11.    As a result of Defendants' fraudulent scheme, GEICO has incurred damages of more than $940,000.00, which represents payments voluntarily made by GEICO based on the representations contained in the billing submitted by the Defendants.

## THE PARTIES

### I.    Plaintiffs

12.    Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are each Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

### II.    Defendants

13.    John Doe Defendant "1" (hereinafter, the "Secret Owner") is presently not identifiable but is secretly controlling and profiting from the DME Providers, and who conspired

with the Defendants and others who are not presently identifiable at various Clinics, to obtain prescriptions for medically unnecessary Fraudulent Equipment purportedly issued by the Referring Providers which were used by the Defendants as the basis to submit bills to GEICO and other New York automobile insurers seeking payment for the Fraudulent Equipment.

14. Defendant Mateev is domiciled in, resides in, and is a citizen of Brooklyn, New York and is listed as the paper owner of Rapid Supply. Mateev is not and has never been a licensed healthcare provider. Mateev, at all relevant times, has been one the primary drivers of the fraudulent scheme, as he participated in a scheme with the Secret Owner purporting to own, operate, and control Rapid Supply, associated with others not presently identifiable to obtain the illegitimate and medically unnecessary prescriptions from the Referring Providers, and used those prescriptions to submit bills to GEICO and other New York automobile insurance companies for the Fraudulent Equipment.

15. Defendant Rapid Supply is a New York corporation incorporated in Brooklyn with its principal place of business within a residential apartment located at 1775 Coney Island Avenue, Brooklyn, New York. Rapid Supply was incorporated on May 31, 2024, and is owned on paper and purportedly controlled by Mateev. In actuality, Secret Owner operated, managed, controlled and financially benefited from Rapid Supply and, with the aid of Mateev, used Rapid Supply to submit fraudulent billing to GEICO and other New York automobile insurers.

16. Defendant Dariabayeva is domiciled in, resides in, and is a citizen of Brooklyn, New York and is listed as the paper owner of LD Health Supply and Med Supply Delivery. Dariabayeva is not and has never been a licensed healthcare provider. Dariabayeva, at all relevant times, has been one the primary drivers of the fraudulent scheme, as she participated in a scheme with the Secret Owner purporting to own, operate, and control LD Health Supply and Med Supply

Delivery, associated with others not presently identifiable to obtain the illegitimate and medically unnecessary prescriptions from the Referring Providers, and used those prescriptions to submit bills to GEICO and other New York automobile insurance companies for the Fraudulent Equipment.

17.     Defendant LD Health Supply is a New York corporation incorporated in New York with its principal place of business within a residential apartment located at 412 W 49th Street, New York, New York. LD Health Supply was incorporated on August 14, 2023, and is owned on paper and purportedly controlled by Dariabayeva. In actuality, the Secret Owner operated, managed, controlled, and financially benefited from LD Health Supply and, with the aid of Dariabayeva, used as LD Health Supply a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

18.     Defendant Med Supply Delivery is a New York corporation incorporated in Brooklyn with its principal place of business within a residential apartment located at 390 Kings Highway, Brooklyn, New York. Med Supply Delivery was incorporated on February 1, 2024, and is owned and purportedly controlled by Dariabayeva. In actuality, the Secret Owner operated, managed, controlled, and financially benefited from Med Supply Delivery and, with the aid of Dariabayeva, used Med Supply Delivery as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

19.     Defendant Assimkanova is domiciled in, resides in, and is a citizen of Queens, New York. Assimkanova is listed as the paper owner of Med Care Supply. Assimkanova is not and has never been a licensed healthcare provider. Assimkanova, at all relevant times, has been one the primary drivers of the fraudulent scheme, as she participated in a scheme with the Secret Owner purporting to own, operate, and control Med Care Supply, associated with others not presently

identifiable to obtain the illegitimate and medically unnecessary prescriptions from the Referring Providers, and used those prescriptions to submit bills to GEICO and other New York automobile insurance companies for the Fraudulent Equipment.

20.    Defendant Med Care Supply is a New York corporation incorporated in Brooklyn with its principal place of business at 398 Kings Highway, Brooklyn, New York. Med Care Supply was incorporated on September 13, 2024, and is owned on paper and purportedly controlled by Assimkanova. In actuality, the Secret Owner operated, managed, controlled, and financially benefited from Med Care Supply and, with the aid of Assimkanova, used Med Care Supply as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

21.    The John Doe Defendants are individuals who are not presently identifiable and include the Clinic Controllers associated with the Clinics, who are not licensed healthcare professionals but who unlawfully own and control the Clinics and the relationships with the Referring Providers, and who have conspired with the Defendants and Secret Owner to further the fraudulent scheme committed against GEICO and other New York automobile insurers for their own economic benefit.

## JURISDICTION AND VENUE

22.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

23.    Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to

28 U.S.C. § 1367.

24.    Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern

District of New York is the District where a substantial amount of the activities forming the basis

of the Complaint occurred, and where one or more of Defendants reside.

## ALLEGATIONS COMMON TO ALL CLAIMS

25.    GEICO underwrites automobile insurance in the State of New York.

I.    **An Overview of the Pertinent Laws**

A.    **Pertinent Laws Governing No-Fault Insurance Reimbursement**

26.    New York's "No-Fault" laws are designed to ensure that injured victims of motor

vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that

they need.

27.    Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y.

Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65,

et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to

provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

28.    In New York, No-Fault Benefits include up to $50,000.00 per Insured for medically

necessary expenses that are incurred for healthcare goods and services, including goods for DME

and OD. See N.Y. Ins. Law § 5102(a).

29.    In New York, claims for No-Fault Benefits are governed by the New York

Workers' Compensation Fee Schedule (the "New York Fee Schedule").

30.    The implementing regulation adopted by the Superintendent of Insurance, 11

N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section
> 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New
> York State or local licensing requirement necessary to perform such service in New

York.

31.    Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary goods and services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

32.    In the alternative, a healthcare service provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500" or "CMS-1500 form").

33.    Pursuant to Section 403 of the New York State Insurance Law, the NF-3 Forms submitted by healthcare service providers to GEICO, and to all other insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

34.    Similarly, all HCFA-1500 (CMS-1500) forms submitted by a healthcare service provider to GEICO, and to all other automobile insurers, must be verified by the healthcare service provider subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

**B.    Pertinent Regulations Governing No-Fault Benefits, DME and OD**

35.    Under the No-Fault Laws, No-Fault Benefits can be used to reimburse medically necessary DME or OD that was provided pursuant to a lawful prescription from a licensed

healthcare provider. See N.Y. Ins. Law § 5102(a). By extension, DME or OD that was provided without a prescription, pursuant to an unlawful prescription, or pursuant to a prescription from a layperson or individual not lawfully licensed to provide prescriptions, is not reimbursable under No-Fault.

36.     Under New York State's Public Health Law, "a practitioner may not make a referral to a health care provider for the furnishing of any health or health related items or services where such practitioner . . . has any of the following financial relationships without disclosing to the patient such financial relationship: . . . (b) a compensation arrangement" See N.Y. P.H.L. § 238-d(1). A practitioner is defined to include "a licensed or registered physician, dentist, podiatrist, chiropractor, nurse, midwife, physician assistant or specialist assistant, physical therapist, or optometrist." See N.Y. P.H.L. § 238(11).

37.     A health care provider is defined to include "a purveyor of health or health related supplies, appliances or equipment," which are DME suppliers such as the DME Providers. See N.Y. P.H.L. § 238(6). A compensation arrangement, as referenced in N.Y. P.H.L. § 238-d, includes any remuneration, whether directly, indirectly, overly, covertly, in cash, or in kind that is between a practitioner and a health care provider. See N.Y. P.H.L. § 238-a(5)(a).

38.     DME generally consists of items that can withstand repeated use and primarily consists of items used for medical purposes by individuals in their homes. For example, DME can include items such as bed boards, cervical pillows, orthopedic mattresses, electronic muscle stimulator units ("EMS units"), infrared heat lamps, lumbar cushions, orthopedic car seats, transcutaneous electrical nerve stimulators ("TENS units"), cervical tractions, whirlpool baths, and the Fraudulent Equipment purportedly dispensed by Defendants.

39.     OD consists of instruments that are applied to the human body to align, support, or

correct deformities, or to improve the movement of the spine, joints, or limbs. These devices come into direct contact with the exterior of the body, and include such items as cervical collars (i.e., "whiplash" collars), lumbar supports, knee supports, ankle supports, wrist braces, and similar devices.

40.    Title 20 of the City of New York Administrative Code imposes licensing requirements on healthcare providers located within the City of New York which engage in a business which substantially involves the selling, renting, repairing, or adjusting of products for the disabled, which includes DME and OD.

41.    Specifically, New York City's Administrative Code requires DME/OD suppliers to obtain a Dealer in Products for the Disabled License ("Dealer in Products License") issued by the New York City Department of Consumer and Worker Protection, formerly Department of Consumer Affairs, ("DCWP") in order to lawfully provide DME or OD to the disabled, which is defined as "a person who has a physical or medical impairment resulting from anatomical or physiological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques." See 6 RCNY § 2-271; NYC Admin. Code §20-425.

42.    It is unlawful for any DME/OD supplier to engage in the selling, renting, fitting, or adjusting of products for the disabled within the City of New York without a Dealer in Products License. See NYC Admin. Code §20-426.

43.    A Dealer in Products License is obtained by filing a license application with the DCWP. The application requires that the applicant identify, among other pertinent information, the commercial address of where the DME/OD supplier is physically operating from.

44.    The license application for a Dealer in Products License also requires the applicant

to affirm that they are authorized to complete and submit the application on behalf of the corporate entity seeking a license and that the information contained in the application is true, correct, and complete. The affirmation associated with the application requires a signature that is made under penalty for false statements under Sections 175.30, 175.35, and 210.45 of New York's Penal Law.

45.    To ensure that Insureds' $50,000.00 in minimum No-Fault Benefits are not artificially depleted by inflated DME or OD charges, the maximum charges that may be submitted by healthcare providers for DME and OD are set forth in the New York Fee Schedule.

46.    In a June 16, 2004 Opinion Letter entitled "No-Fault Fees for Durable Medical Equipment," the New York Insurance Department recognized the harm inflicted on Insureds by inflated DME and OD charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

47.    As it relates to DME and OD, the New York State Workers' Compensation Board adopted the New York State Workers' Compensation Durable Medical Equipment Fee Schedule ("Fee Schedule") that became effective on April 4, 2022.

48.    Among other things, the Fee Schedule limited the reimbursement rates of certain previously abused DME charges and established a maximum permissible charge for certain specifically listed pieces of DME ("Fee Schedule item"). The charges for the reimbursement of DME by the New York State Workers' Compensation Board are reflected in 12 N.Y.C.R.R. § 442.2 (2022).

49.    Similarly, effective June 1, 2023, the New York State Department of Financial Services issued an amendment to 11 N.Y.C.R.R. 68, adding Part E of Appendix 17-C, to address

No-Fault reimbursement for DME that is not specifically identified by the Fee Schedule ("Non-Fee Schedule item").

50.     For Fee Schedule items, Palmetto GBA, LLC ("Palmetto"), a contractor for the Center for Medicare & Medicaid Services ("CMS"), was tasked with analyzing and assigning HCPCS Codes that should be used by DME and OD companies to seek reimbursement for – among other things – Fee Schedule items. The HCPCS Codes and their definitions provide specific characteristics and requirements that an item of DME or OD must meet in order to qualify for reimbursement under a specific HCPCS Code.

51.     For Non-Fee Schedule items that are provided by a DME/OD supplier, the maximum permissible reimbursement rate is the lesser of: (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or (2) the usual and customary price charged to the general public. See 11 N.Y.C.R.R. 68, Appendix 17-C, Part E.

52.     For Non-Fee Schedule items, the New York State Insurance Department recognized that a provider's acquisition cost must be limited to costs incurred by a provider in a "bona fide arms-length transaction" because "[t]o hold otherwise would turn the No-Fault reparations system on its head if the provision for DME permitted reimbursement for 150% of any documented cost that was the result of an improper or collusive arrangement." See New York State Insurance Department, No-Fault Fees for Durable Medical Equipment, June 16, 2004 Opinion Letter.

53.     Additionally, many HCPCS Codes relate to OD that has either been prefabricated, custom-fitted, and/or customized. Palmetto published a guide to differentiating between custom-

fitted items and off-the-shelf, prefabricated items, entitled, <u>Correct Coding – Definitions Used for Off-the Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised</u>. As part of its coding guide, Palmetto has identified who is qualified to properly provide custom-fitted OD.

54.     Accordingly, when a healthcare provider submits a bill to collect charges from an insurer for DME or OD using either a NF-3 or HCFA-1500 form, the provider represents – among other things – that:

(i)     The provider is in compliance with all significant statutory and regulatory requirements;

(ii)    The provider received a legitimate prescription that was issued in accordance with the requirements of applicable laws and is for reasonable and medically necessary DME from a healthcare practitioners that is licensed to issue such prescriptions;

(iii)   The DME or OD identified in the bill was actually provided to the patient based upon a legitimate prescription identifying medically necessary item(s);

(iv)    The HCPCS Code identified in the bill actually represents the DME or OD that was provided to the patient; and

(v)     The fee sought for DME or OD provided to an Insured was not in excess of the price contained in the Fee Schedule or the standard used for a Non-Fee Schedule item.

## II.     <u>Defendants' Fraudulent Scheme</u>

### A.     <u>The DME Providers' Common Secret Ownership</u>

55.     The Secret Owner, Paper Owner Defendants, and John Doe Defendants conspired to design and implement a complex fraudulent scheme in which the DME Providers were used consecutively and in conjunction with each other between February 2024 and August 2025 to bill GEICO and other New York automobile insurers for over a million dollars in No-Fault Benefits to which they were never entitled to receive.

56.     While each of the DME Providers were formed and listed as being independently

owned by one of the Paper Owner Defendants, all the DME Providers were actually controlled by Secret Owner, who also profited from the fraudulent scheme committed against GEICO and other New York automobile-insurers.

57.    The Secret Owner was able to secretly control and profit from the DME Providers by using each of the Paper Owner Defendants as "straw" owners who would place their name on documents required to be filed with the State of New York and City of New York to lawfully operate the DME Providers.

58.    In keeping with the fact that Secret Owner actually owned, controlled, and profited from the DME Providers, and used the Paper Owner Defendants to further the fraudulent scheme herein, there is significant overlap in the operations of the DME Providers that could only exist through the Secret Owner's involvement

| Entity | Paper Owner | Start Date | Stop Date |
|---|---|---|---|
| Med Supply Delivery | Daribayeva | 02/20/2024 | 04/24/2024 |
| Rapid Supply | Matveev | 05/20/2024 | 10/3/2024 |
| LD Health Supply | Daribayeva | 06/28/2024 | 11/5/2024 |
| Med Care Supply | Assimkanova | 09/26/2024 | 02/25/2025 |

59.    For example, the Secret Owner, together with the Paper Owner Defendants, operated the DME Providers in a sequential fashion, allowing for some overlap to transition the billing from one DME Provider to the next, all as part of a "quick hit" strategy to limit the amount of billing submitted from any one of the DME Providers and mask the common fraudulent scheme:

(i)    Med Supply Delivery billed GEICO for dates of service between February 20, 2024, and April 24, 2024;

(ii)    Rapid Supply billed GEICO for dates of service between May 20, 2024, and October 3, 2024;

(iii)    LD Health Supply billed GEICO for dates of service between June 28, 2024, and November 5, 2024; and

(iv)    Med Care Supply billed GEICO for dates of service between September 26,

2024, and August 12, 2025.

60.    Additionally, the DME Providers all implemented the same fraudulent billing pattern whereby, after purportedly providing Fraudulent Equipment to Insureds on a single date, the DME Providers would divide the charges into two separate bills in order to artificially lower the total of each bill and attempt to avoid detection of their fraud.

61.    Further, each of the DME Providers would "split" their billing in the same exact way, with one of the bills containing same five pieces of Fraudulent Equipment: (i) Massager; (ii) EMS Belt; (iii) EMS Unit; (iv) "Infrared Lmap [*sic*]"; and (v) Hydrotherapy Whirlpool.

62.    In fact, these bills were virtually identical, including the order of the DME identified on the bill and the same misspelling of the word "Lmap" for Lamp.

63.    For example:

| DME Provider | Billing Example |
|---|---|
| Med Supply Delivery | 15. REPORT OF SERVICES RENDERED – ATTACH ADDITIONAL SHEETS IF NECESSARY<br><br>Date of service / Place of service / Description of treatment or health service rendered / Modifier Units / Fee Schedule Treatment Code / Charges<br>02/21/2024 / 1894 EASTCHESTER ROAD, SUITE 201, BRONX, NY 10461 / Massager / / E1399 / 318.00<br>02/21/2024 / 1894 EASTCHESTER ROAD, SUITE 201, BRONX, NY 10461 / E.M.S. Belt / / E0731 / 18.00<br>02/21/2024 / 1894 EASTCHESTER ROAD, SUITE 201, BRONX, NY 10461 / E.M.S. Unit (4 Unit) / / E1399 / 288.25<br>02/21/2024 / 1894 EASTCHESTER ROAD, SUITE 201, BRONX, NY 10461 / INFRARED LMAP / / E0205 / 325.00<br>02/21/2024 / 1894 EASTCHESTER ROAD, SUITE 201, BRONX, NY 10461 / HYDROTHERAPY WHIRLPOOL / 10 / E1310 / 570.00<br>Total charge per day<br><br>Total charges to date $ $1,519.25 |

**Rapid Supply**

| 15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY | | | | | | |
|---|---|---|---|---|---|---|
| Date of service | Place of service | Description of treatment or health service rendered | Modifier | Units | Fee Schedule Treatment Code | Charges |
| 06/24/2024 | 1894 EASTCHESTER ROAD, SUITE 201, BRONX, NY 10461 | MASSAGER | | | E1399 | 318.00 |
| 06/24/2024 | 1894 EASTCHESTER ROAD, SUITE 201, BRONX, NY 10461 | E.M.S. BELT | | | E0731 | 18.00 |
| 06/24/2024 | 1894 EASTCHESTER ROAD, SUITE 201, BRONX, NY 10461 | E.M.S. Unit (4 Unit) | | | E1399 | 288.25 |
| 06/24/2024 | 1894 EASTCHESTER ROAD, SUITE 201, BRONX, NY 10461 | INFRARED LMAP | | | E0205 | 325.00 |
| 06/24/2024 | 1894 EASTCHESTER ROAD, SUITE 201, BRONX, NY 10461 | HYDROTHERAPY WHIRLPOOL | | 10 | E1310 | 570.00 |
| | | | | | Total charge per day | |
| | | | | | Total charges to date $ | $1,519.25 |

**LD Health Supply**

| 15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY | | | | | | |
|---|---|---|---|---|---|---|
| Date of service | Place of service | Description of treatment or health service rendered | Modifier | Units | Fee Schedule Treatment Code | Charges |
| 07/24/2024 | 2118 CONEY ISLAND AVE, 3RD FL, BROOKLYN, NY 11223 | Massager | | | E1399 | 318.00 |
| 07/24/2024 | 2118 CONEY ISLAND AVE, 3RD FL, BROOKLYN, NY 11223 | E.M.S. Belt | | | E0731 | 18.00 |
| 07/24/2024 | 2118 CONEY ISLAND AVE, 3RD FL, BROOKLYN, NY 11223 | E.M.S. Unit (4 Unit) | | | E1399 | 288.25 |
| 07/24/2024 | 2118 CONEY ISLAND AVE, 3RD FL, BROOKLYN, NY 11223 | INFRARED LMAP | | | E0205 | 325.00 |
| 07/24/2024 | 2118 CONEY ISLAND AVE, 3RD FL, BROOKLYN, NY 11223 | HYDROTHERAPY WHIRLPOOL | | 10 | E1310 | 570.00 |
| | | | | | Total charge per day | |
| | | | | | Total charges to date $ | $1,519.25 |

**Med Care Supply**

| 15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY | | | | | | |
|---|---|---|---|---|---|---|
| Date of service | Place of service | Description of treatment or health service rendered | Modifier | Units | Fee Schedule Treatment Code | Charges |
| 10/29/2024 | 1894 EASTCHESTER ROAD, SUITE 201, BRONX, NY 10461 | MASSAGER | | | E1399 | 318.00 |
| 10/29/2024 | 1894 EASTCHESTER ROAD, SUITE 201, BRONX, NY 10461 | E.M.S. BELT | | | E0731 | 18.00 |
| 10/29/2024 | 1894 EASTCHESTER ROAD, SUITE 201, BRONX, NY 10461 | E.M.S. Unit (4 Unit) | | | E1399 | 288.25 |
| 10/29/2024 | 1894 EASTCHESTER ROAD, SUITE 201, BRONX, NY 10461 | INFRARED LMAP | | | E0205 | 325.00 |
| 10/29/2024 | 1894 EASTCHESTER ROAD, SUITE 201, BRONX, NY 10461 | HYDROTHERAPY WHIRLPOOL | | 10 | E1310 | 570.00 |
| | | | | | Total charge per day | |
| | | | | | Total charges to date $ | $1,519.25 |

64.     Moreover, and as shown in each of the examples identified in Paragraph 62 above and will be discussed further below, each DME Provider made virtually identical coding misrepresentations and reimbursement misrepresentations in their billing to GEICO.

65.     In further keeping with the fact that the DME Providers are actually controlled by the Secret Owner and were operated as part of a common scheme, multiple DME Providers used virtually the same delivery receipts in their supporting documentation to GEICO. For example:

| DME Provider | Sample Delivery Receipt |
| --- | --- |
| Rapid Supply |  |

| | |
|---|---|
| LD Health Supply | **LD HEALTH SUPPLY INC**<br>2843 BATCHELDER STR BROOKLYN, NY 11235 Tel:(718) 957-8850<br>Assignment of Benefits & Delivery Slip<br><br>Patient Name: ▇▇▇▇  DOA: 7/25/2024<br>Patient Address: ▇▇▇▇<br>Patient Tel: ▇▇▇  DOB: ▇▇▇  Sex: ▇<br><br>hereby assign to LD HEALTH SUPPLY INC, all rights privileges and remedies to payment for health care services provided by assignee to which I am entitled under Article 51 (the No-Fault statute) of the Insurance Law. The Assignee hereby certifies that they have not received any payment from or on behalf of the Assignor and shall not pursue payment directly from the Assignor for services provided to said Assignee for injuries sustained due to the motor vehicle accident which occurred on 7/25/2024, not withstanding any other agreement to the contrary. This agreement may be revoked by the assignee when benefits are not payable based upon the assignor's lack of coverage and/or violation of a policy condition due to the actions or conduct of the assignor.<br><br>ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME, AND SHALL ALSO BE SUBJECT TO A CIVIL PENALTY NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION.<br><br>ITEMS RECEIVED BY PATIENT<br>LSO APL Control Adjustable<br><br>Signature of Patient  Signature of the provider<br>8.28.24<br>Date  FILE #: LDH00146 |
| Med Care Supply | **MED CARE SUPPLY DELIVERY INC**<br>398 KINGS HWY UNIT 102 BROOKLYN, NY 11223 Tel:(347) 209-3794<br>Assignment of Benefits & Delivery Slip<br><br>Patient Name: ▇▇▇▇  DOA: 8/10/2024<br>Patient Address: ▇▇▇▇<br>Patient Tel: ▇▇▇  DOB: ▇▇▇  Sex: ▇<br><br>hereby assign to MED CARE SUPPLY DELIVERY INC, all rights privileges and remedies to payment for health care services provided by assignee to which I am entitled under Article 51 (the No-Fault statute) of the Insurance Law. The Assignee hereby certifies that they have not received any payment from or on behalf of the Assignor and shall no pursue payment directly from the Assignor for services provided to said Assignee for injuries sustained due to the motor vehicle accident which occurred on 8/10/2024, not withstanding any other agreement to the contrary. This agreement may be revoked by the assignee when benefits are not payable based upon the assignor's lack of coverage and/or violation of a policy condition due to the actions or conduct of the assignor.<br><br>ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME, AND SHALL ALSO BE SUBJECT TO A CIVIL PENALTY NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION.<br><br>ITEMS RECEIVED BY PATIENT<br>CERVICAL TRACTION W/PUMP<br><br>Signature of Patient  Signature of the provider<br>Date  FILE #: MC00007 |

66.    As part of the common scheme, based on collusive arrangements between the Secret Owner, the Paper Owner Defendants, Clinic Controllers, and other John Doe Defendants, the DME Providers would receive virtually identical prescriptions for medically unnecessary

Fraudulent Equipment from overlapping Clinics and Referring Providers.

67. For example:

(i) All the DME Providers received prescriptions for Fraudulent Equipment purportedly issued from John McGee DO ("McGee") and/or his employees who worked at, among other locations, 2723 Atlantic Avenue Brooklyn, NY 11207 and 1894 Eastchester Road Bronx New York 10461;

(ii) All the DME Providers received prescriptions for Fraudulent Equipment from 2118 Coney Island 3rd Floor Brooklyn NY 11223 and 611 East 76th Street Brooklyn NY 11236, from Wei Hong Xu, NP ("Xu"); and

(iii) All the DME Providers received prescriptions for Fraudulent Equipment from 1568 Ralph Avenue Brooklyn NY 11236 from Jean Pierre Barakat ("Barakat").

**B.    Overview of the Defendants' Common Fraudulent Scheme**

68. The Secret Owner, together with the Paper Owner Defendants, conceived and implemented a complex fraudulent scheme in which the DME Providers were used as vehicles to bill for No-Fault benefits to which they were never entitled to receive and collectively billed GEICO alone for over $1.7 million in Fraudulent Equipment.

69. To mask their common scheme and maximize the amount of No-Fault benefits Defendants could receive, the Secret Owner along with the Paper Owner Defendants, used the DME Providers in a sequential fashion to divide and artificially lower the total billing that they submitted to No-Fault insurance carriers, including GEICO.

70. In keeping with the fact that Defendants divided their billing in order maximize the amount of No-Fault benefits they could collect, the DME Providers operated in sequential order, typically with some overlap to allow more than one entity to bill No-Fault insurance carriers, including GEICO, at a single time.

71. Through the complex multi-corporation scheme, the Secret Owner and the Paper Owner Defendants used the DME Providers to bill and collect No-Fault Benefits from GEICO and

other automobile insurers that they were never entitled to collect. Specifically:

(i)    Between February 20, 2024, and April 24, 2024, Med Supply Delivery submitted more than $579,000.00 in fraudulent claims to GEICO, wrongfully obtained more than $288,000.00, and there is more than $291,000.00 in additional fraudulent claims that have yet to be adjudicated but which Defendants continue to seek payment of from GEICO;

(ii)    Between May 20, 2024, and October 3, 2024, Rapid Supply submitted more than $375,000.00 in fraudulent claims to GEICO, wrongfully obtained more than $208,000.00, and there is more than $167,000.00 in additional fraudulent claims that have yet to be adjudicated but which Defendants continue to seek payment of from GEICO;

(iii)    Between June 28, 2024, and November 5, 2024, LD Health Supply submitted more than $244,000.00 in fraudulent claims to GEICO, wrongfully obtained more than $175,000.00, and there is more than $69,000.00 in additional fraudulent claims that have yet to be adjudicated but which Defendants continue to seek payment of from GEICO; and

(iv)    Between September 26, 2024, and August 12, 2025, Med Care Supply submitted more than $518,000.00 in fraudulent claims to GEICO, wrongfully obtained more than $267,000.00, and there is more than $251,000.00 in additional fraudulent claims that have yet to be adjudicated but which Defendants continue to seek payment of from GEICO.

72.    The Defendants were able to perpetrate the fraudulent scheme against GEICO described below by obtaining illegitimate prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers because of collusive agreements with the Clinic Controllers and other John Doe Defendants who are associated with the Clinics.

73.    Notably, none of Defendants marketed or advertised the DME Providers to the general public, and they lacked any genuine retail or office location, and operated without any legitimate efforts to attract patients who might need DME or healthcare practitioners who might legitimately prescribe DME.

74.    Similarly, the Paper Owner Defendants did virtually nothing that would be expected of the owner of a legitimate DME supply company to develop its reputation in the

medical community or to attract patients who might need DME or healthcare practitioners who might legitimately prescribe DME.

75.    Instead, the Defendants entered into collusive agreements with the John Doe Defendants who were associated with both the Clinics and the Referring Providers whereby kickbacks and other financial incentives were paid so that Defendants would receive large volumes of prescriptions from the Referring Providers in relation to Insureds who were being treated at the Clinics.

76.    The prescriptions obtained by the Defendants for Fraudulent Equipment were never given to the Insureds to fill, but as part of the fraudulent scheme, they were routed directly to the Defendants at the direction of the Clinic Controllers to ensure that the Insureds did not attempt to fill the prescriptions with legitimate DME and OD retailers, who would likely question the legitimacy of the prescriptions, the volume of prescriptions, or the need for the DME/OD in the first instance.

77.    The prescriptions obtained by the Defendants for Fraudulent Equipment included prescriptions for both Fee Schedule and Non-Fee Schedule items which the Defendants used (i) as a basis to purportedly provide and bill GEICO for whatever DME/OD the Defendants decided to dispense, not what was determined based upon a legitimate prescriptions by a licensed healthcare processional; (ii) to misrepresent the nature and quality of the items that they actually dispensed, so as to claim entitlement to a higher fee payable by GEICO and other automobile insurers; and (iii) to misrepresent the maximum reimbursement rate they were entitled to receive from GEICO for Non-Fee Schedule items.

78.    As part of the scheme, the Clinic Controllers directed that the prescriptions issued by the Referring Providers should often be written in a generic, vague, non-descript manner so that

the DME Providers could have the flexibility to designate the products that would result in the highest forms of reimbursement from GEICO.

79.    The Defendants then used the intentionally generic and vague prescriptions to unlawfully choose one of many variations of DME and/or OD that could be provided to the Insureds. As a result, in virtually every circumstance available, the DME Providers purported to provide the Insureds with a variation that had high – if not one of the highest – maximum reimbursement rates under the applicable fee schedule.

80.    In addition to unlawfully choosing specific types of Fraudulent Equipment to provide Insureds, each of Defendants engaged in a virtually identical pattern of submitting bills to GEICO seeking No-Fault Benefits based on HCPCS Codes that did not accurately represent – sometimes in any way – the Fraudulent Equipment purportedly provided to the Insureds in order to obtain higher reimbursement rates than what was permissible.

81.    By submitting bills to GEICO seeking No-Fault Benefits for Fraudulent Equipment based upon specific HCPCS Codes, the DME Providers represented that they provided Insureds with the particular items associated with each unique HCPCS Code, and that such specific item was medically necessary as determined by a healthcare provider licensed to prescribe DME and/or OD.

82.    However, to the extent that any Fraudulent Equipment was actually provided to Insureds, the Fraudulent Equipment did not match the HCPCS Codes identified in the bills submitted by the DME Providers.

83.    Instead, to the extent that any Fraudulent Equipment was provided to the Insureds, Defendants provided Insureds with inexpensive and poor quality Fraudulent Equipment, which did not contain all the features required by the HCPCS Codes identified in the bills submitted by

the DME Providers.

84.    The Fraudulent Equipment actually provided to Insureds – again to the extent that any Fraudulent Equipment was actually provided – were inexpensive and poor-quality items that only qualified under HCPCS Codes with significantly lower maximum reimbursement rates than the HCPCS Codes actually identified in the bills submitted by Defendants.

85.    In furtherance of their scheme to defraud GEICO and other automobile insurers, Defendants also submitted bills for Non-Fee Schedule items that falsely indicated they were seeking reimbursement at the lesser of 150% of Defendants' legitimate acquisition cost or the cost to the general public for the same item.

86.    In actuality, the bills from Defendants submitted to GEICO for Non-Fee Schedule items contained grossly inflated reimbursement rates that did not accurately represent the lesser of 150% of Defendants' legitimate acquisition cost or the cost to the general public.

87.    As a further part of this scheme, Defendants submitted bills to GEICO with reimbursement rates that indicated the Non-Fee Schedule items purportedly provided Insureds were expensive and high-quality, when the Fraudulent Equipment provided was cheap and poor quality, and was purchased from wholesalers for a small fraction of the reimbursement rates contained in the bills.

88.    In fact, the cheap and poor-quality Fraudulent Equipment provided to the Insureds – again, to the extent that any Fraudulent Equipment was actually provided – were easily obtainable from legitimate internet or brick-and-motor retailers for a small fraction of the reimbursement rates identified in the bills submitted to GEICO by Defendants.

89.    Each of the DME Providers made virtually identical fraudulent misrepresentations in the HCPCS Codes used and the reimbursement rates charged to GEICO that would have been

impossible but for their participation in a common scheme and control by the Secret Owner.

90.      Further, in an effort to hide the extent of their fraudulent acts against GEICO, the DME Providers each also submitted multiple bills to GEICO for Fraudulent Equipment that was purportedly provided to Insureds on the same date.

91.      The Defendants' submission of multiple bills to GEICO in this manner was in reality designed to further mask the fraudulent scheme and an effort to keep the individual totals on each bill artificially lower and avoid detection by GEICO.

92.      After obtaining prescriptions for Fraudulent Equipment as a result of their collusive relationships with the Clinic Controllers and other John Doe Defendants, the Defendants in turn then billed GEICO for: (i) Fraudulent Equipment that was not reasonable nor medically necessary; (ii) Fraudulent Equipment that was not based on valid prescriptions from licensed healthcare providers; (iii) Fraudulent Equipment that did not represent the HCPCS codes contained in the bills to GEICO; and/or (iv) Fraudulent Equipment with inflated charges that far exceeded the value of the actual products they provided to GEICO's Insureds.

**C.      The Fraudulent Scheme – Predetermined Fraudulent Protocols Associated with the Prescriptions**

93.      Defendants were able to obtain prescriptions for Fraudulent Equipment that could be used as a basis to submit billing to GEICO through predetermined fraudulent protocols that were established between and among the Defendants, John Doe Defendants, and the Referring Providers.

94.      Through these predetermined fraudulent protocols, the Defendants obtained prescriptions for Fraudulent Equipment that were not medically necessary and were created solely to financially enrich the Defendants and John Doe Defendants, not to genuinely treat and/or benefit the Insureds.

95.    As set forth below, the extent of the Insureds' motor vehicle accidents, physical conditions, and conservative treatment plans demonstrates a pattern of prescribing and dispensing Fraudulent Equipment to the Insureds that was not medically necessary to treat the Insureds post-accident condition.

96.    Virtually all of the Insureds who were prescribed the Fraudulent Equipment identified in Exhibits "1" through "4," were involved in relatively minor and low impact "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

97.    Concomitantly, almost none of the Insureds identified in Exhibits "1" through "4," whom the Referring Providers purported to treat, suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

98.    In keeping with the fact that the Insureds identified in Exhibits "1" through "4" suffered only minor injuries – to the extent that they had any injuries at all – as a result of the relatively minor accidents, many of the Insureds did not seek treatment at any hospital as a result of their accidents.

99.    To the extent that the Insureds in the claims identified in Exhibits "1" through "4" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way with nothing more serious than a minor soft tissue injury such as a sprain or strain.

100.    However, despite virtually all of the Insureds being involved in relatively minor and low-impact accidents and only suffering from sprains and strains – to the extent that the Insureds were actually injured – virtually all of the Insureds were subject to extremely similar prescription protocols for numerous pieces of Fraudulent Equipment that were not medically necessary.

101.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in an automobile accident.

102.    For example, an individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in an automobile accident.

103.    The prescriptions for Fraudulent Equipment that were purportedly issued to the Insureds identified in Exhibits "1" - "4" were issued pursuant to predetermined fraudulent protocols set forth at each Clinic, and not because the Fraudulent Equipment was medically necessary for each Insured based upon his or her individual symptoms or presentations.

104.    For example, the predetermined fraudulent protocols at each Clinic (i) included issuing predetermined sets of Fraudulent Equipment that applied to virtually all Insureds, regardless of each patient's individual symptoms or presentation, and (ii) were not based upon what was medically necessary for each patient. Instead, they were created based upon how the John Doe Defendants, and others including the Defendants, could profit from exploiting prescriptions purportedly issued by the Referring Providers.

105.    In other words, no legitimate physician, chiropractor, other licensed healthcare provider, or professional entity would permit prescriptions for Fraudulent Equipment to be issued based upon the fraudulent protocols at the various Clinics that were the prescription sources for the Defendants.

106.    In a legitimate setting, when a patient injured in a motor vehicle accident seeks treatment from a healthcare provider, the patient's subjective complaints are evaluated, and the treating provider will direct a specific course of treatment based upon the patient's individual symptoms or presentation.

107.    Furthermore, in a legitimate setting, during a patient's treatment, a healthcare provider may – but generally does not – prescribe DME and/or OD.

108.    In determining whether to prescribe DME and/or OD to a patient – in a legitimate setting – a healthcare provider should evaluate multiple factors, including: (i) whether the specific DME and/or OD could have any negative effects based upon the patient's physical condition and medical history; (ii) whether the DME and/or OD is likely to help improve the patient's complained of condition; and (iii) whether the patient is likely to use the DME and/or OD. In all circumstances, any prescribed DME and/or OD would always directly relate to each patient's individual symptoms or presentation.

109.    If a healthcare provider determines that DME and/or OD is medically necessary after considering a patient's individual circumstances and situations, in a legitimate setting, the healthcare provider would document in a contemporaneous medical record, such as an evaluation report, what specific DME and/or OD was prescribed, why it was medically necessary, or how it would help the Insureds.

110.    Further, in a legitimate setting, when a patient returns for an examination after being prescribed DME and/or OD, the healthcare provider would inquire – and appropriately report – whether the previously prescribed DME and/or OD aided the patient's subjective complaints. Such information is typically addressed so the healthcare provider can recommend a further course of treatment regarding the previously prescribed DME and/or OD or newly issued DME and/or OD.

111.    It is improbable – to the point of an impossibility – that virtually all of the Insureds identified in Exhibits "1" - "4" who were treated at a specific Clinic would receive virtually identical prescriptions for numerous items of Fraudulent Equipment, despite being different ages, in different physical conditions, and involved in different motor vehicle accidents.

112.    It is even more improbable – to the point of impossibility – that virtually all of the Insureds identified in Exhibits "1" - "4" who were treated by different Referring Providers at a specific Clinic would receive virtually identical prescriptions for numerous items of Fraudulent Equipment despite being different ages, in different physical conditions, and involved in different motor vehicle accidents.

113.    Here, and in keeping with the fact that the prescriptions provided to the Defendants were for medically unnecessary Fraudulent Equipment obtained as part of an insurance scheme in which there were predetermined fraudulent protocols, virtually all of the Insureds identified in Exhibits "1" - "4" that were treated at a specific Clinic were issued virtually identical prescriptions for a predetermined set of Fraudulent Equipment, despite being different ages, in different physical conditions, and involved in different motor vehicle accidents.

114.    To the extent that there was a contemporaneously dated evaluation report, the evaluation report virtually always failed to explain – and oftentimes failed to identify – the Fraudulent Equipment identified on the prescriptions provided to the Defendants and used by the Defendants to bill GEICO for the charges identified in Exhibits "1" - "4."

115.    For the reasons set forth above, and below, in each of the claims identified in Exhibits "1" - "4," the Defendants falsely represented that the Fraudulent Equipment was provided pursuant to legitimate prescriptions from healthcare providers for medically necessary DME or OD, and were, therefore, entitled to collect No-Fault Benefits in the first instance, when, in fact, the prescriptions were for medically unnecessary Fraudulent Equipment issued as part of the Defendants' insurance fraud scheme.

### 1.    Collusive Arrangements to Obtain Medically Unnecessary Prescriptions

116.    To gain access to Insureds so that they could implement and execute their

fraudulent scheme and maximize the amount of No-Fault Benefits that could be obtained from GEICO and other New York automobile insurers, the Defendants entered into collusive agreements with the Clinic Controllers and other John Doe Defendants in order to procure and direct prescriptions to the DME Providers that were illegitimate and for medically unnecessary Fraudulent Equipment.

117.   Since the inception of the DME Providers, the Defendants engaged in various collusive arrangements with the Clinic Controllers and other John Doe Defendants pursuant to which Defendants paid kickbacks or other financial incentives in exchange for being provided prescriptions to fill from the Referring Providers for the Fraudulent Equipment that could then be used by the Defendants to support their charges to GEICO and other New York automobile insurers. The improper financial arrangements were key to the fraudulent scheme in that they allowed the Defendants to submit hundreds of charges for Fraudulent Equipment to GEICO and other New York automobile insurers. However, the collusive nature of the arrangement goes beyond the simple of payment of money or other financial incentives, but includes the Defendants: (i) paying fictitious businesses associated with the John Doe Defendants; (ii) obtaining prescriptions directly from the staff at the Clinics, without any communication or involvement by the Insureds, and (iii) providing the Fraudulent Equipment to the Clinic and its staff, without any interaction with the Insureds.

118.   The collusive arrangements allowed the scheme to remain undetected by the Insureds and allowed the Defendants to access large volumes of prescriptions that in turn afforded them the opportunity to submit charges for thousands of dollars in Fraudulent Equipment for each Insured to GEICO and other automobile insurers.  But for the collusive arrangements, neither the John Doe Defendants nor the Referring Providers would have had any reason to direct a substantial

volume of these medically unnecessary prescriptions for Fraudulent Equipment to the DME Providers to purportedly fill.

119.    For example, as a result of these collusive relationships, Rapid Supply began receiving prescriptions from the Clinics and billing GEICO for Fraudulent Equipment eleven days before it was ever even incorporated, billing GEICO for dates of service starting on May 20, 2024, when Rapid Supply was incorporated with the State of New York on May 31, 2024.

120.    Upon information and belief, the Referring Providers were remunerated by the Clinic Controllers or other John Doe Defendants, whether financially or through some other economic quid pro quo (e.g. the ability to treat the Insureds and independently bill GEICO), for the Referring Providers' willingness to permit prescriptions to be issued in their names and to be given to DME suppliers, including the DME Providers, rather than given to the Insureds or to a bona-fide DME/OD retailer, who would likely question its legitimacy.

121.    The collusive relationship between the Defendants and John Doe Defendants in relation to the prescriptions, issued without a specific disclosure to the patient of the financial relationship between the Referring Provider and the DME Providers, are the very kind of arrangements that are prohibited by N.Y. Public Health Law § 238-d. No such disclosures required by Public Health Law § 238-d were ever made to the Insureds identified in Exhibits "1" – "4." Rather, because of the nefarious nature of the relationship between the Defendants and the John Doe Defendants, the arrangements between and among the Defendants, John Doe Defendants, and Referring Providers were concealed from the Insureds.

122.    As a result of these collusive relationships, the Defendants (rather than the Insured or a bona-fide DME /OD retailer) were given the illegitimate prescriptions, which were (i) were for medically unnecessary Fraudulent Equipment that was not based upon each Insured's

individual need; (ii) were not signed by a Referring Provider or contained a photocopied signature; (iv) were undated; (v) did not contain the name of the Referring Provider who issued the prescription; and/or (vii) were issued on a date the Referring Provider did not treat or otherwise examine the Insured.

123.    Illustrative of the fact that the collusive relationships between the Defendants and the John Doe Defendants were designed to obtain illegitimate prescriptions associated with Insureds treating at the Clinics, the following are representative examples of prescriptions purportedly issued by Colin Clarke, M.D. ("Clarke"), containing a photocopied or otherwise duplicated signature:

Example 1: Clarke Photocopied Prescriptions Issued from the Clinic Located at 164-10 Crocheron Avenue, Flushing, NY 11358

| | |
|---|---|
| Prescription to **Rapid Supply** for Insured AD Dated 05/29/2024 | *[signature]* NYS License No. 208242 |
| Prescription to **Rapid Supply** for Insured DM Dated 05/29/2024 | *[signature]* NYS License No. 208242 |
| Prescription to **Rapid Supply** for Insured JD Dated 05/29/2024 | *[signature]* NYS License No. 208242 |
| Prescription to **LD Health Supply** for Roque Geronimo RG Dated 06/24/2024 | *[signature]* NYS License No. 208242 |
| Prescription to **Med Care Supply** for Insured NP Dated 09/08/2024 | *[signature]* NYS License No. 208242 |

Example 2: Wei Hong Xu, N.P.  Photocopied Prescriptions Issued from the Clinic Located at 611 East 76th Street Brooklyn, NY 11236

| | |
|---|---|
| Prescription to **Med Supply Delivery** for Insured DJ Dated 01/31/2024 | |
| Prescription to **Med Supply Delivery** for Insured VH Dated 02/07/2024 | |
| Prescription to **Med Supply Delivery** for Insured CS Dated 03/06/2024 | |

Example 3: Junie White, N.P. Photocopied Prescriptions Issued from the Clinic Located at 2723 Atlantic Avenue, Brooklyn, New York

| | |
|---|---|
| Prescription to **Med Care Supply** for Insured KP Dated 10/16/2024 | |
| Prescription to **Med Care Supply** for Insured DE Dated 10/16/2024 | |

124.    Further, as a result of these collusive arrangements, the Defendants also received purported prescriptions for Fraudulent Equipment from the Clinics that were never even signed by a Referring Provider:

| | |
|---|---|
| Prescription for Insured JM to **Med Supply Delivery** Dated 02/16/2024 from the Clinic Located at 89-25 130th Street, Richmond Hill, New York |  |
| Prescription for Insured EL to **Rapid Supply** Dated 06/03/2024 from the Clinic Located at 8408 Queens Boulevard, Elmhurst, New York | |

| Prescription for Insured JF to **Rapid Supply** Dated 06/05/2024 from 2723 Atlantic Avenue, Brooklyn, New York |  |
| --- | --- |

125.    These are only representative examples.

126.    In further keeping with the fact that the Defendants entered into collusive agreements and participated in kickback schemes with the Clinic Controllers and John Doe Defendants associated with the Clinics, the Defendants issued checks totaling over $100,000.00 to a shell company by the name of Alpha NY Express Inc. ("Alpha NY Express").

127.    Alpha NY Express is not a legitimate company. Rather, Alpha NY Express has arrangements with the Clinic Controllers and John Doe Defendants associated with the Clinics to funnel medically unnecessary prescriptions, including medically unnecessary prescriptions for DME and pharmaceuticals, to fraudulent healthcare providers – including the Defendants.

128.    In keeping with the fact that the payments the Defendants made to Alpha NY Express were to further a collusive agreement and obtain prescriptions from Clinics in exchange for kickbacks, payments received by Alpha NY Express were converted into cash.

129.    In contrast to bona fide DME suppliers, the Defendants willingly obtained prescriptions through collusive arrangements and submitted these prescriptions to support their

charges to GEICO and other automobile insurers.

130.    These Clinics included but were not limited to: (i) 89-25 130th Street Richmond Hill, New York; (ii) 1894 Eastchester Road, Bronx, New York; (iii) 2723 Atlantic Avenue, Brooklyn, New York; (iv) 1568 Ralph Avenue, Brooklyn, New York; (v) 164-10 Crocheron Avenue, Flushing, New York; (vi) 8408 Queens Boulevard, Elmhurst, New York.

131.    Although ostensibly organized to provide a range of healthcare services to Insureds at a single location, many of the Clinics operate under the unlawful ownership and control of unlicensed laypersons, with a revolving door of healthcare providers providing treatment to the Insureds and other patients without any continuity of care.

132.    In fact, GEICO has received billing from an ever-changing number of fraudulent healthcare providers at a variety of different Clinics that were the sources of the prescriptions for Defendants, which start and stop operations without any purchase or sale of a "practice," without any legitimate transfer of patient care from one professional to another, and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's No-Fault insurance system.

133.    For example, GEICO has received billing for purported healthcare services rendered from the Clinic located at 1568 Ralph Avenue, Brooklyn, New York from a "revolving door" over 80 different healthcare providers.

134.    Unlicensed laypersons, rather than the healthcare professionals working in the Clinics, created and controlled the patient base at the Clinics, and directed fraudulent protocols used to maximize profits for the generation of revenue for their own benefit and the benefit of those with whom they are associated without regard to actual patient care.

2.    **The Predetermined Fraudulent Prescription Protocol at the Clinics**

135.    Through their collusive arrangements with the John Doe Defendants, Defendants were able to obtain medically unnecessary and otherwise illegitimate prescriptions for Fraudulent Equipment purportedly issued by a variety of Referring Providers who purported to treat Insureds at the Clinics pursuant to predetermined fraudulent protocols, which serves to further illustrate Defendants' fraudulent scheme.

136.    The Insureds identified in Exhibits "1" - "4" that were prescribed Fraudulent Equipment from the Clinics were typically involved in minor "fender-bender" motor vehicle accidents and then purportedly treated by a variety of healthcare providers at the Clinics.

137.    However, during the course of their treatment at the Clinics, the Insureds were regularly prescribed Fraudulent Equipment that was medically unnecessary, not supported by medical records, and was issued pursuant to predetermined fraudulent protocols.

138.    The Defendants' control by the Secret Owner, scheme to shift billing from one DME Provider to the next, and collusion with the Clinic Controllers and other John Doe Defendants associated with the Clinics for access to the Clinics' predetermined, fraudulent protocols for the prescription of Fraudulent Equipment is illustrated by the protocols employed at the Clinic located at 1894 Eastchester Road, Bronx, New York (the "Eastchester Rd. Clinic").

139.    Regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, or whether each patient would actually use the Fraudulent Equipment, the Referring Providers purportedly prescribed, at a minimum, the following Fraudulent Equipment to virtually every Insured identified in Exhibits "1" – "4" who treated at the Eastchester Rd. Clinic: (i) "Bed Board"; (ii) "Egg Crate Mattress"; (iii) "Cervical Collar"; (iv) "Cervical Pillow"); (v) "EMS Unit w/ Belt"; (vi) "Infared [*sic*] Lamp"; (vii) "Lumbar Cushion"; (viii) "Lumbar Sacral Support"; (ix) "Personal Massager"; (x) "Thermal

Moist Heat Pad"; and (xi) "Whirlpool."

140.    The Referring Providers would also prescribe Insureds an "Orthopedic Car Seat" if they were identified as being the driver in the underlying accident.

141.    In addition, the Referring Providers would also routinely purportedly prescribe one or more separate additional prescriptions to Insureds for the following Fraudulent Equipment: (i) "LSO W/APL Control Custom"; (ii) "Cervical Traction"; (iii) "Shoulder Orthosis"; and/or (v) "KO Custom Fitted."

142.    Further, Referring Providers would also routinely provide Insureds with prescriptions for other types of Fraudulent Equipment that were provided to other medical supply companies.

143.    The prescriptions purportedly issued by Referring Providers at the Eastchester Rd. Clinic (which are representative of the types of prescriptions issued at all of the Clinics) were not based upon legitimate examinations by the Referring Providers that evaluated each Insured's individual symptom or presentation and determined whether and what type of DME and/or OD to provide.

144.    Rather, these prescriptions were based upon a predetermined fraudulent protocol established by the Clinic Controllers and other John Doe Defendants and were obtained by the Defendants through improper financial arrangements with the Clinic Controllers and other John Doe Defendants.

145.    Furthermore, the initial examination or follow-up examination reports, to the extent that there were contemporaneously dated examination reports, did not accurately identify the Fraudulent Equipment purportedly prescribed to the Insureds. In fact, the reports did not contain sufficient information describing the medical necessity of the prescribed Fraudulent Equipment.

146.     Even more, the follow-up examination reports from the Referring Providers at the Eastchester Rd. Clinic failed to include any meaningful information regarding the Insureds' use of the previously prescribed Fraudulent Equipment, to the extent it was even mentioned at all.

147.     Further illustrative of the fact that the Insureds identified in Exhibits "1" – "4" that were treated at the Eastchester Rd. Clinic were prescribed Fraudulent Equipment pursuant to predetermined fraudulent protocols, the Insureds were frequently purportedly issued prescriptions by Referring Providers for a variety of Fraudulent Equipment on days that the Referring Provider did not examine or otherwise treated the Insureds, or issued prescriptions that were undated.

148.     The predetermined fraudulent protocols related to the prescriptions issued and the Defendants' common scheme to shift the billing from one DME Provider to the next are illustrated by the following examples, which are representative of all the common fraudulent protocols employed at all the Clinics:

(i)     On December 19, 2023, an Insured named JH was purportedly involved in a motor vehicle accident and thereafter purportedly started treatment at the Eastchester Rd. Clinic. After an initial examination with Kopach on January 11, 2024, Kopach purportedly issued a prescription in the name of JH for:

|   | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Osteogenesis Stimulator<br>Waterproof Tape<br>Powered Pressure Reducing Air Mattress | Non-Defendant DME supplier |

On January 25, 2024, Kopach purportedly issued a prescription in the name of JT, despite not examining or otherwise treating JH on that date, for:

|   | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Cervical Collar<br>Cervical Pillow<br>EMS Unit w/ Belt<br>Infrared Lamp<br>Lumbar Cushion | **Med Supply Delivery** |

| | | |
|---|---|---|
| | Lumbar Sacral Support<br>Orthopedic Car Seat<br>Personal Massager<br>Thermal Moist Heat Pad<br>Whirlpool<br>Water Circulation Heat w/ Pump | |

On February 8, 2024, Kopach purportedly issued a prescription in the name of JH, despite not examining or otherwise treating JH on that date, for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Cervical Traction | **Med Supply Delivery** |

On February 15, 2024, Kopach purportedly issued a prescription in the name of JH, despite not examining or otherwise treating JH on that date, for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | LSO w/ APL Control Custom | **Med Supply Delivery** |

(ii)     On January 18, 2024, an Insured named BS was purportedly involved in a motor vehicle accident and thereafter purportedly started treatment at the Eastchester Rd. Clinic. After an initial examination with Kopach on January 22, 2024, Kopach purportedly issued a prescription in the name of BS for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Osteogenesis Stimulator<br>Waterproof Tape<br>Powered Pressure Reducing Air Mattress | Non-Defendant DME supplier |

On January 25, 2024, Kopach purportedly issued a prescription in the name of BS, despite not examining or otherwise treating BS on that date, for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Cervical Collar<br>Cervical Pillow<br>EMS Unit w/ Belt<br>Infrared Lamp<br>Lumbar Cushion<br>Lumbar Sacral Support<br>Orthopedic Car Seat | **Med Supply Delivery** |

|  | Personal Massager<br>Thermal Moist Heat Pad<br>Whirlpool<br>Water Circulation Heat w/ Pump<br>Knee Brace<br>Shoulder Immobilizer |  |
|---|---|---|

On February 26, 2024, Kopach purportedly examined and issued a prescription in the name of BS for:

|  | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Cervical Traction | **Med Supply Delivery** |

(iii)   On January 26, 2024, an Insured named CA was purportedly involved in a motor vehicle accident and thereafter purportedly started treatment at the Eastchester Rd. Clinic. After an initial examination with Kopach on January 29, 2024, Kopach purportedly issued two prescriptions in the name of CA for:

|  | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Cervical Collar<br>Cervical Pillow<br>EMS Unit w/ Belt<br>Infrared Lamp<br>Lumbar Cushion<br>Lumbar Sacral Support<br>Orthopedic Car Seat<br>Personal Massager<br>Thermal Moist Heat Pad<br>Whirlpool<br>Shoulder Immobilizer | **Med Supply Delivery** |
| 2 | Osteogenesis Stimulator<br>Waterproof Tape<br>Powered Pressure Reducing Air Mattress | Non-Defendant DME supplier |

On March 11, 2024, Kopach purportedly examined and issued a prescription in the name of CA for:

|  | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Cervical Traction w/ Pump<br>Lumber Traction w/ Pump | **Med Supply Delivery** |

On March 25, 2024, Kopach purportedly issued a prescription in the name of CA, despite not examining or otherwise treating CA on that date, for:

|   | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Cervical Traction<br>LSO w/ APL Control Custom | **Med Supply Delivery** |

(iv)   On February 7, 2024, an Insured named JD was purportedly involved in a motor vehicle accident and thereafter purportedly started treatment at the Eastchester Rd. Clinic. After an initial examination with Kopach on February 8, 2024, Kopach purportedly issued two prescriptions in the name of JD for:

|   | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Cervical Collar<br>Cervical Pillow<br>EMS Unit w/ Belt<br>Infrared Lamp<br>Lumbar Cushion<br>Lumbar Sacral Support<br>Orthopedic Car Seat<br>Personal Massager<br>Thermal Moist Heat Pad<br>Whirlpool<br>Ankle Brace<br>Knee Brace<br>Shoulder Immobilizer<br>Water Circulation Heat w/ Pump<br>Wrist Support | **Med Supply Delivery** |
| 2 | Osteogenesis Stimulator<br>Waterproof Tape<br>Powered Pressure Reducing Air Mattress | Non-Defendant DME supplier |

On March 4, 2024, Kopach purportedly examined and issued a prescription in the name of JD for:

|   | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | LSO W/ APL Control Custom | Non-Defendant DME supplier |

On March 6, 2024, Kopach purportedly issued a prescription in the name of JD, despite not examining or otherwise treating JD on that date, for:

|   | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Osteogenesis Stimulator<br>Waterproof Tape<br>Powered Pressure Reducing Air Mattress | Non-Defendant DME supplier |

On March 25, 2024, Kopach purportedly issued a prescription in the name of JD, despite not examining or otherwise treating JD on that date, for:

|   | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Shoulder Orthosis | **Med Supply Delivery** |

On April 1, 2024, Kopach purportedly issued a prescription in the name of JD, despite not examining or otherwise treating JD on that date, for:

|   | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | KO Custom Fitted | Non-Defendant DME supplier |

(v)    On April 16, 2024, an Insured named AG was purportedly involved in a motor vehicle accident and thereafter purportedly started treatment at the Eastchester Rd. Clinic. After an initial examination with Kopach on April 18, 2024, Kopach purportedly issued two prescriptions in the name of AG for:

|   | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Cervical Collar<br>Cervical Pillow<br>EMS Unit w/ Belt<br>Infrared Lamp<br>Lumbar Cushion<br>Lumbar Sacral Support<br>Orthopedic Car Seat<br>Personal Massager<br>Thermal Moist Heat Pad<br>Whirlpool<br>Shoulder Immobilizer | Non-Defendant DME supplier |
| 2 | Osteogenesis Stimulator<br>Waterproof Tape<br>Powered Pressure Reducing Air Mattress | Non-Defendant DME supplier |

On May 6, 2024, Kopach purportedly examined and issued a prescription in the name of AG for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Cervical Traction | **Rapid Supply** |

On May 13, 2024, Kopach purportedly issued a prescription in the name of AG, despite not examining or otherwise treating AG on that date, for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | LSO w/ APL Control Custom Shoulder Orthosis | **Rapid Supply** |

On May 23, 2024, Kopach purportedly issued a prescription in the name of AG, despite not examining or otherwise treating AG on that date, for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Shoulder Orthosis | **Rapid Supply** |

(vi)    On April 25, 2024, an Insured named AM was purportedly involved in a motor vehicle accident and thereafter purportedly started treatment at the Eastchester Rd. Clinic. On May 6, 2024, Kopach purportedly issued a prescription in the name of AM, despite not examining or otherwise treating AM on that date, for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Cervical Collar<br>Cervical Pillow<br>EMS Unit w/ Belt<br>Infrared Lamp<br>Lumbar Cushion<br>Lumbar Sacral Support<br>Orthopedic Car Seat<br>Personal Massager<br>Thermal Moist Heat Pad<br>Whirlpool | **Rapid Supply** |

On May 23, 2024, Kopach purportedly issued a prescription in the name of AM, despite not examining or otherwise treating AM on that date, for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Cervical Traction | **Rapid Supply** |

On June 6, 2024, Kopach purportedly issued a prescription in the name of AM, despite not examining or otherwise treating AM on that date, for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | LSO w/ APL Control Custom | **Rapid Supply** |

(vii)   On May 8, 2024, an Insured named GC was purportedly involved in a motor vehicle accident and thereafter purportedly started treatment at the Eastchester Rd. Clinic. After an initial examination with Kopach on May 9, 2024, Kopach purportedly issued two prescriptions in the name of GC for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Cervical Collar<br>Cervical Pillow<br>EMS Unit w/ Belt<br>Infrared Lamp<br>Lumbar Cushion<br>Lumbar Sacral Support<br>Orthopedic Car Seat<br>Personal Massager<br>Thermal Moist Heat Pad<br>Whirlpool<br>Wrist Support | **Rapid Supply** |
| 2 | Osteogenesis Stimulator<br>Waterproof Tape<br>Powered Pressure Reducing Air Mattress | Non-Defendant DME supplier |

On May 30, 2024, Kopach purportedly issued a prescription in the name of GC, despite not examining or otherwise treating GC on that date, for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Cervical Traction | **Rapid Supply** |

(viii) On May 26, 2024, an Insured named JV was purportedly involved in a motor vehicle accident and thereafter purportedly started treatment at the Eastchester Rd. Clinic. After an initial examination with Kopach on May 30, 2024, Kopach purportedly issued two prescriptions in the name of JV for:

|   | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Cervical Collar<br>Cervical Pillow<br>EMS Unit w/ Belt<br>Infrared Lamp<br>Lumbar Cushion<br>Lumbar Sacral Support<br>Orthopedic Car Seat<br>Personal Massager<br>Thermal Moist Heat Pad<br>Whirlpool<br>Shoulder Immobilizer | **Rapid Supply** |
| 2 | Osteogenesis Stimulator<br>Waterproof Tape<br>Powered Pressure Reducing Air Mattress | Non-Defendant DME supplier |

On August 15, 2024, Kopach purportedly issued a prescription in the name of JV, despite not examining or otherwise treating JV on that date, for:

|   | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Shoulder Orthosis | Non-Defendant DME supplier |

On September 5, 2024, Kopach purportedly issued a prescription in the name of JV, despite not examining or otherwise treating JV on that date, for:

|   | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Shoulder Orthosis | Non-Defendant DME supplier |

On September 9, 2024, Kopach purportedly issued a prescription in the name of JV, despite not examining or otherwise treating JV on that date, for:

|   | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | LSO w/ APL Control Custom | Non-Defendant DME supplier |

(ix)    On July 10, 2024, an Insured named EC was purportedly involved in a motor vehicle accident and thereafter purportedly started treatment at the Eastchester Rd. Clinic. After an initial examination with Kopach on July 11, 2024, Kopach purportedly issued two prescriptions in the name of EC for:

|   | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Cervical Collar<br>Cervical Pillow<br>EMS Unit w/ Belt<br>Infrared Lamp<br>Lumbar Cushion<br>Lumbar Sacral Support<br>Orthopedic Car Seat<br>Personal Massager<br>Thermal Moist Heat Pad<br>Whirlpool<br>Shoulder Immobilizer | Non-Defendant DME supplier |
| 2 | Osteogenesis Stimulator<br>Waterproof Tape<br>Powered Pressure Reducing Air Mattress | Non-Defendant DME supplier |

On August 26, 2024, Kopach purportedly examined and issued a prescription in the name of EC, for:

|   | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | LSO w/ APL Control Custom Shoulder Orthosis | **LD Health Supply** |

On September 9, 2024, Kopach purportedly issued a prescription in the name of EC, despite not examining or otherwise treating EC on that date, for:

|   | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Cervical Traction | Non-Defendant DME supplier |

On September 13, 2024, Kopach purportedly issued a prescription in the name of EC, despite not examining or otherwise treating EC on that date, for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | LSO w/ APL Control Custom | Non-Defendant DME supplier |

(x)    On July 18, 2024, an Insured named ML was purportedly involved in a motor vehicle accident and thereafter purportedly started treatment at the Eastchester Rd. Clinic. After an initial examination with Kopach on August 1, 2024, Kopach purportedly issued three prescriptions in the name of ML for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Cervical Collar<br>Cervical Pillow<br>EMS Unit w/ Belt<br>Infrared Lamp<br>Lumbar Cushion<br>Lumbar Sacral Support<br>Orthopedic Car Seat<br>Personal Massager<br>Thermal Moist Heat Pad<br>Whirlpool<br>Knee brace<br>Hot/Cold Pack | Non-Defendant DME supplier |
| 2 | Pneumatic Compression Device | Non-Defendant DME supplier |
| 3 | Powered Pressure-Reducing Air Mattress<br>Wearable PEMF Device | Non-Defendant DME supplier |

On August 26, 2024, Kopach purportedly issued a prescription in the name of ML, despite not examining or otherwise treating ML on that date, for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Cervical Traction | **LD Health Supply** |

On September 9, 2024, Kopach purportedly issued a prescription in the name of ML, despite not examining or otherwise treating ML on that date, for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | KO Custom Fitted | Non-Defendant DME supplier |

On September 18, 2024, Kopach purportedly examined and issued a prescription in the name of ML for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | KO Custom Fitted | **Med Care Supply** |

On November 14, 2024, Kopach purportedly examined and issued a prescription in the name of ML for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Shoulder Orthosis | **Med Care Supply** |

(xi)　On July 25, 2024, an Insured named JD was purportedly involved in a motor vehicle accident and thereafter purportedly started treatment at the Eastchester Rd. Clinic. After an initial examination with Kopach on July 29, 2024, Kopach purportedly issued two prescriptions in the name of JD for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Cervical Collar<br>Cervical Pillow<br>EMS Unit w/ Belt<br>Infrared Lamp<br>Lumbar Cushion<br>Lumbar Sacral Support<br>Orthopedic Car Seat<br>Personal Massager<br>Thermal Moist Heat Pad<br>Whirlpool<br>Knee brace<br>Shoulder Immobilizer | Non-Defendant DME supplier |
| 2 | Osteogenesis Stimulator<br>Waterproof Tape | Non-Defendant DME supplier |

| | Powered Pressure-Reducing Air Mattress Pneumatic Compression Device | |
|---|---|---|

On August 8, 2024, Kopach purportedly issued a prescription in the name of JD, despite not examining or otherwise treating JD on that date, for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Cervical Traction | **LD Health Supply** |

On August 13, 2024, Kopach purportedly issued a prescription in the name of JD, despite not examining or otherwise treating JD on that date, for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | LSO w/ APL Control Custom | **LD Health Supply** |

On November 18, 2024, Kopach purportedly issued a prescription in the name of JD, despite not examining or otherwise treating JD on that date, for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | KO Custom Fitted | Non-Defendant DME Provider |

(xii)    On July 27, 2024, an Insured named YS was purportedly involved in a motor vehicle accident and thereafter purportedly started treatment at the Eastchester Rd. Clinic. After an initial examination with Kopach on August 1, 2024, Kopach purportedly issued three prescriptions in the name of YS for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Cervical Collar Cervical Pillow EMS Unit w/ Belt Infrared Lamp Lumbar Cushion Lumbar Sacral Support Orthopedic Car Seat Personal Massager Thermal Moist Heat Pad Whirlpool | Non-Defendant DME supplier |

|   | Hot/Cold Pack<br>Knee Brace<br>Shoulder Immobilizer |  |
|---|---|---|
| 2 | Powered Pressure-Reducing Air Mattress<br>Wearable PEMF Device | Non-Defendant DME supplier |
| 3 | Pneumatic Compression Device | Non-Defendant DME supplier |

On August 22, 2024, Kopach purportedly issued a prescription in the name of YS, despite not examining or otherwise treating YS on that date, for:

|   | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Cervical Traction | Non-Defendant DME supplier |

On August 26, 2024, Kopach purportedly issued a prescription in the name of YS, despite not examining or otherwise treating YS on that date, for:

|   | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | LSO w/ APL Control Custom | **LD Health Supply** |

On September 9, 2024, Kopach purportedly examined and issued a prescription in the name of YS for:

|   | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | KO Custom Fitted Shoulder Orthosis | Non-Defendant DME supplier |

(xiii)   On July 18, 2024, an Insured named FG was purportedly involved in a motor vehicle accident and thereafter purportedly started treatment at the Eastchester Rd. Clinic. After an initial examination with Kopach on August 1, 2024, Kopach purportedly issued three prescriptions in the name of FG for:

|   | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Cervical Collar<br>Cervical Pillow<br>EMS Unit w/ Belt<br>Infrared Lamp<br>Lumbar Cushion<br>Lumbar Sacral Support<br>Orthopedic Car Seat | Non-Defendant DME supplier |

| | | |
|---|---|---|
| | Personal Massager<br>Thermal Moist Heat Pad<br>Whirlpool<br>Hot/Cold Pack<br>Knee Brace<br>Shoulder Immobilizer | |
| 2 | Powered Pressure-Reducing Air Mattress<br>Wearable PEMF Device | Non-Defendant DME supplier |
| 3 | Pneumatic Compression Device | Non-Defendant DME supplier |

On August 26, 2024, Kopach purportedly issued a prescription in the name of FG, despite not examining or otherwise treating FG on that date, for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Cervical Traction | **LD Health Supply** |

On September 9, 2024, Kopach purportedly issued a prescription in the name of FG, despite not examining or otherwise treating FG on that date, for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | LSO w/ APL Control Custom | **LD Health Supply** |

On September 9, 2024, Kopach purportedly issued a prescription in the name of FG, despite not examining or otherwise treating FG on that date, for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Shoulder Orthosis | Non-Defendant DME supplier |

On September 18, 2024, Kopach purportedly examined and issued a prescription in the name of FG for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | KO Custom Fitted | **Med Care Supply** |

(xiv)    On October 11, 2024, an Insured named EA was purportedly involved in a motor vehicle accident and thereafter purportedly started treatment at the Eastchester Rd. Clinic. On October 10, 2024, before the accident even happened, Kopach purportedly issued two prescriptions in the name of EA, despite not examining or otherwise treating EA on that date, for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Cervical Collar<br>Cervical Pillow<br>EMS Unit w/ Belt<br>Infrared Lamp<br>Lumbar Cushion<br>Lumbar Sacral Support<br>Orthopedic Car Seat<br>Personal Massager<br>Thermal Moist Heat Pad<br>Whirlpool<br>Hot/Cold Pack<br>Knee Brace | **Med Care Supply** |

On November 26, 2024, Kopach purportedly examined and issued a prescription in the name of EA for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | LSO w/ APL Control | Non-Defendant DME supplier |

On December 5, 2024, Kopach purportedly issued two prescriptions in the name of EA, despite not examining or otherwise treating EA on that date, for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Wearable PEMF Device<br>Powered Pressure-Reducing Air Mattress | Non-Defendant DME supplier |
| 2 | Pneumatic Compression Device | Non-Defendant DME supplier |

On December 12, 2024, Kopach purportedly examined and issued a prescription in the name of EA, despite not examining or otherwise treating EA on that date, for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | KO Custom Fitted | Non-Defendant DME supplier |

(xv)    On October 11, 2024, an Insured named JM was purportedly involved in a motor vehicle accident and thereafter purportedly started treatment at the Eastchester Rd. Clinic. After an initial examination with Kopach on October 14, 2024, Kopach purportedly issued three prescriptions in the name of JM for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Cervical Collar<br>Cervical Pillow<br>EMS Unit w/ Belt<br>Infrared Lamp<br>Lumbar Cushion<br>Lumbar Sacral Support<br>Orthopedic Car Seat<br>Personal Massager<br>Thermal Moist Heat Pad<br>Whirlpool<br>Hot/Cold Pack | **Med Care Supply** |
| 2 | Osteogensis Stimulator<br>Powered Pressure Reducing Air Mattress | Non-Defendant DME supplier |
| 3 | Pneumatic Compression Device | Non-Defendant DME supplier |

On October 31, 2024, Kopach purportedly issued a prescription in the name of JM, despite not examining or otherwise treating JM on that date, for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Cervical Traction | **Med Care Supply** |

On November 14, 2024, Kopach purportedly examined and issued a prescription in the name of JM for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | LSO w/ APL Control | Non-DME Defendant supplier |

On December 10, 2024, Kopach purportedly examined and issued a prescription in the name of JM for:

|   | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Powered Pressure Reducing Air Mattress<br>Wearable PEMF Device | Non-DME Defendant supplier |

149.    These are only representative examples.

150.    In fact, virtually all the Insureds identified in Exhibits "1" – "4" who treated at the Eastchester Rd. Clinic were issued prescriptions for Fraudulent Equipment pursuant to the predetermined fraudulent protocols identified above, despite only being involved in relatively minor and low-impact motor vehicle accidents.

**D.    The Defendants' Manipulation of the Prescriptions**

151.    Once the Defendants obtained the prescriptions purportedly issued by the Referring Providers as a result of the Defendants' collusive arrangements with the John Doe Defendants, the Defendants used the prescriptions to bill GEICO for whatever DME or OD they wanted.

152.    In doing so, the Defendants did not bill GEICO for medically necessary DME and OD as determined by a licensed healthcare provider. Instead, the Defendants unlawfully decided what DME and OD to provide Insureds without a proper prescription from a licensed healthcare provider.

153.    As part of the Defendants' common fraudulent scheme and collusive arrangement with the John Doe Defendants, they utilized the vague and generic prescriptions purportedly issued by the Referring Providers to misrepresent to GEICO the nature of the items actually prescribed and misrepresent that the Fraudulent Equipment was for DME/OD that was determined by a licensed healthcare provider to be medically necessary for each Insured.

154.    Upon obtaining the vague and generic prescriptions from Clinic Controllers or other persons associated with the Clinics pursuant to the predetermined protocols and collusive arrangements described above, the Defendants were provided with the opportunity to choose one of several different pieces of Fraudulent Equipment, with varying reimbursement rates in the applicable fee schedule, that relate to the vague and generic terms indicated in the prescriptions.

155.    The ability to choose which specific type of DME and/or OD to provide an individual is specifically reserved for healthcare providers authorized by law to prescribe DME and/or OD.

156.    As unlicensed healthcare professionals, the Paper Owner Defendants were and are not legally authorized to prescribe or direct that an Insured receive any specific type of DME and/or OD. Similarly, the DME Providers are not licensed professional corporations and do not employ any healthcare professionals who can legally prescribe or direct that an Insured receive any specific type of DME and/or OD.

157.    However, when the Defendants received vague and generic prescriptions for Fraudulent Equipment to purportedly provide Insureds, many of the items in the prescriptions were not specific enough to identify a specific item of DME and/or OD that could be provided to the Insureds.

158.    As a result, and as part of their common scheme, whenever the vague and generic prescriptions identified a type of Fraudulent Equipment that had multiple different HCPCS Codes, which are based on the specific and unique features associated with the item, the Defendants each chose to bill GEICO using the same specific HCPCS Codes thereby representing that they purportedly provided those unique pieces of Fraudulent Equipment to the Insureds.

159.    In a legitimate setting, upon receiving a vague and generic prescription for a type

of DME and/or OD, the provider of DME and/or OD would contact the referring healthcare provider to request clarification on the specific items and features necessary to dispense to each patient.

160.    However, in all the claims identified in Exhibits "1" – "4," whenever there was a vague and generic prescription for a type of DME and/or OD, the Defendants never contacted the Referring Provider to request clarification. Instead, the Defendants made their own determination as to which unique item of Fraudulent Equipment to provide each Insured.

161.    Furthermore, in each and every circumstance where the vague and generic prescriptions allowed the Defendants to choose a unique piece of Fraudulent Equipment, the Defendants billed GEICO for, and thereby chose to purportedly provide the Insured with, the type of Fraudulent Equipment that resulted in one of the higher maximum reimbursable amounts under the applicable fee schedule.

162.    For example, in many of the prescriptions issued to the Defendants that are part of the claims identified in Exhibits "1" through "4," the prescriptions requested that the Defendants provide such generic items as, but not limited to, a "Lumbar Sacral Support," "LSO w/ APL Control fitted/adjustable," "LSO APL Custom Fitted," "LSO w/ APL Control Custom," or a "Lumber [*sic*] Traction w/ Pump" without any further specification.

163.    This vague and generic language in the prescriptions from the Referring Providers for lumbar supports directly relates to over 20 different unique HCPCS Codes, each with its own distinguishing features and maximum reimbursable amount, which can be dispensed to Insureds, including:

(i)    HCPCS Code L0625, a lumbar orthosis device that is flexible, prefabricated and off-the-shelf which has a maximum reimbursement rate of $43.27.

(ii)    HCPCS Code L0626, a lumbar orthosis device with rigid posterior panel(s)

that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $61.25.

(iii)    HCPCS Code L0627, a lumbar orthosis device with rigid anterior and posterior panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $322.98.

(iv)    HCPCS Code L0628, a lumbar-sacral orthosis device that is flexible, prefabricated and off-the-shelf which has a maximum reimbursement rate of $65.92.

(v)     HCPCS Code L0629, a lumbar-sacral orthosis device that is flexible and custom fabricated which has a maximum reimbursement rate of $175.00.

(vi)    HCPCS Code L0630, a lumbar-sacral orthosis device with rigid posterior panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $127.26.

(vii)   HCPCS Code L0631, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $806.64.

(viii)  HCPCS Code L0632, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is custom fabricated, which has a maximum reimbursement rate of $1,150.00.

(ix)    HCPCS Code L0633, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $225.31.

(x)     HCPCS Code L0634, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is custom fabricated, which has a maximum reimbursement rate of $759.92.

(xi)    HCPCS Code L0635, a lumbar-sacral orthosis device with lumbar flexion and rigid posterior frame/panels that is prefabricated, which has a maximum reimbursement rate of $765.98.

(xii)   HCPCS Code L0636, a lumbar-sacral orthosis device with lumbar flexion and rigid posterior frame/panels that is custom fabricated, which has a maximum reimbursement rate of $1,036.35.

(xiii)  HCPCS Code L0637, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $844.13.

(xiv)   HCPCS Code L0638, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is custom fabricated, which has a maximum reimbursement rate of $1,036.35.

(xv)    HCPCS Code L0639, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $844.13.

(xvi)   HCPCS Code L0640, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is custom fabricated, has a maximum reimbursement rate of $822.21.

(xvii)  HCPCS Code L0641, a lumbar orthosis device with rigid posterior panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $53.80.

(xviii) HCPCS Code L0642, a lumbar orthosis device with rigid anterior and posterior panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $283.76.

(xix)   HCPCS Code L0643, a lumbar-sacral orthosis device with rigid posterior panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $111.80.

(xx)    HCPCS Code L0648, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $708.65.

(xxi)   HCPCS Code L0649, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $197.95.

(xxii)  HCPCS Code L0650, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $741.59.

(xxiii) HCPCS Code L0651, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $741.59.

164.    As unlicensed healthcare providers, the DME Providers and the Paper Owner Defendants were not legally permitted to determine which of the above-available options were best suited for each Insured that had generic prescriptions for "Lumbar Sacral Support," "LSO w/

APL Control fitted/adjustable," "LSO APL Custom Fitted," "LSO w/ APL Control Custom," or a "Lumber [*sic*] Traction w/ Pump."

165.    Here, Defendants never contacted any of the Referring Providers whose names appeared on the vague and generic prescriptions for lumbar sacral related Fraudulent Equipment and instead took it upon themselves to decide which specific type of Fraudulent Equipment they would bill GEICO for, and accordingly purportedly provide the Insureds.

166.    In response prescriptions calling for a "Lumbar Sacral Support," each of the DME Providers virtually always submitted a charge of $759.92 using HCPCS Code L0634 pursuant to these generic prescriptions, which has one the highest maximum reimbursable amounts out of the lumbar support items in the Fee Schedule.

167.    Further, in response to prescriptions calling for a "LSO w/ APL Control fitted/adjustable," "LSO APL Custom Fitted," "LSO w/ APL Control Custom," or a "Lumber [*sic*] Traction w/ Pump," each of the DME Providers virtually always submitted a charge of $1,150.00 using HCPCS code L0632 and thereby asserted that they provided the Insureds with that specific item, which resulted in further needlessly inflated charges to GEICO.

168.    Further, and as part of Defendants' common scheme and the control of the Secret Owner, each and every time that each of the DME Providers received a prescription from the Referring Providers for a "KO Custom Fitted," each of the Defendants chose to supply and bill GEICO using HCPCS Code L1832 requesting a reimbursement of $607.55, despite the Fee Schedule containing 20 different types of knee orthoses.

169.    Similarly, and as part of the common scheme and control of the Secret Owner, each and every time that each of the DME Defendants received a prescription from the Referring Providers for a "Shoulder Orthosis" or "Shoulder Orthosis Custom Fit," Defendants chose to

supply and bill GEICO using HCPCS Code L3674 requesting a reimbursement of $896.92, despite the Fee Schedule containing eight different types of shoulder orthoses.

170.    These are only representative examples. In virtually all of the claims for Fraudulent Equipment identified in Exhibits "1" – "4" that are based upon vague and generic language in prescriptions provided by the Referring Providers, the Defendants decided the unique type of Fraudulent Equipment to purportedly provide Insureds without any legal authority to do so or any clarification from the prescribing healthcare provider.

**E.    The Defendants' Common Fraudulent Misrepresentations Regarding the DME and OD Purportedly Dispensed**

171.    In addition to obtaining medically unnecessary prescriptions based upon predetermined fraudulent protocols, collusive arrangements with the John Doe Defendants and dispensing the Fraudulent Equipment without a licensed healthcare provider determining the specific DME/OD was medically necessary, the Defendants each submitted bills to GEICO that misrepresented the DME/OD provided to the Insureds – to the extent that any DME/OD actually was provided.

172.    As part of Defendants' common scheme and controlled by the Secret Owner, the bills submitted to GEICO and other New York automobile insurers by Defendants made virtually identical misrepresentations regarding the HCPCS Codes used for the Fee Schedule items purportedly provided and the maximum reimbursement rate charged for Non-Fee Schedule items.

173.    Specifically, the bills submitted to GEICO by the Defendants each misrepresented, to the extent that any Fraudulent Equipment was provided, that the type of Fraudulent Equipment matched the HCPCS Codes identified in the bills to GEICO, when in fact they did not.

174.    Further, the bills submitted to GEICO by the Defendants each misrepresented, to the extent that any Fraudulent Equipment was provided, that the charges for Non-Fee Schedule

items were less than or equal to the maximum reimbursement rate allowable under the Fee Schedule, when in fact they were not.

> **1.    The Defendants Fraudulently Misrepresented the Fee Schedule Items Purportedly Provided**

175.    When Defendants submitted bills to GEICO and other New York automobile insurers, they represented that the Fraudulent Equipment was not only provided to the Insureds, but also that the HCPCS codes used on the bills properly described the type of Fraudulent Equipment that was provided to the Insureds.

176.    As part of the Defendants' common scheme and their operation at the direction and control of the Secret Owner, each of the DME Providers made virtually identical misrepresentations in the HCPCS Codes used to bill GEICO.

177.    As indicated above, the Fee Schedule specifically defines the requirements for each HCPCS Code to bill for DME and/or OD.

178.    Additionally, Palmetto provides specific characteristics and requirements that DME and OD must meet in order to qualify for reimbursement under a specific HCPCS Code for both Fee Schedule items and Non-Fee Schedule items.

179.    By submitting bills to GEICO containing specific HCPCS Codes, Defendants each represented that the Fraudulent Equipment they purportedly provided to Insureds appropriately corresponded to the HCPCS Codes contained within each bill.

180.    However, in many of the claims for Fraudulent Equipment identified in Exhibits "1" – "4," when Defendants submitted bills to GEICO, they fraudulently represented to GEICO that the HCPCS Codes used to bill GEICO were accurate and appropriate for the Fraudulent Equipment purportedly provided to the Insureds – to the extent that any Fraudulent Equipment was actually provided.

181.    Accordingly, to the extent the prescriptions were actually authorized in the first place, the John Doe Defendants and Referring Providers purposefully provided prescriptions to Defendants that contained general categories of Fraudulent Equipment to purportedly provide the Insureds.

182.    Based upon the vague and generic prescriptions that Defendants received, Defendants were able to choose between multiple types of products that would fit the vague description contained on the prescription.

183.    As part of their common scheme, although several options were available to Defendants based upon the vague and generic prescriptions, Defendants often billed GEICO using HCPCS Codes that contained one of the higher reimbursement amounts and did so for their financial benefit.

184.    However, despite billing for Fraudulent Equipment using HCPCS Codes that had one of the higher reimbursement amounts, to the extent that Defendants provided any of the Fraudulent Equipment, the HCPCS codes in the bills submitted to GEICO often severely misrepresented the type of Fraudulent Equipment that was purportedly provided to the Insureds.

185.    For example, each of Defendants submitted bills to GEICO that fraudulently misrepresented the type of Fraudulent Equipment that they purportedly provided by billing GEICO for customized pieces of Fraudulent Equipment when the Fraudulent Equipment was not customized at all – to the extent that Fraudulent Equipment was actually provided.

186.    As identified in the claims contained within Exhibits "1" – "4," Defendants often billed GEICO for Fraudulent Equipment that was purportedly customized for the Insured. Each HCPCS Code, as defined either by the applicable fee schedule or Palmetto, will specify whether the specific item provided to a patient is either "off-the-shelf" or specifically "custom-fabricated"

or "custom-fitted" for that individual patient.

187.    In order to help clarify the term "custom fabricated," Palmetto defined a custom fabricated orthotic as something that is "individually made for a specific patient. No other patient would be able to use this item. A custom fabricated item is a device which is fabricated based on clinically derived and rectified castings, tracings, measurements, and/or other images (such as x-rays) of the body part. The fabrication may involve using calculations, templates and components. This process requires the use of basic materials including, but not limited to plastic, metal, leather or cloth in the form of uncut or unshaped sheets, bars, or other basic forms and involves substantial work such as vacuum forming, cutting, bending, molding, sewing, drilling and finishing prior to fitting on the patient." See Palmetto, Correct Coding –3-D Printed Orthotic Devices.

188.    In essence, a custom-fabricated orthotic is created and manufactured from scratch for use by a specific patient.

189.    To help clarify the term "custom-fitted," Palmetto defined a custom-fitted orthotic as something that "requires more than minimal self-adjustment at the time of delivery in order to provide an individualized fit, i.e., the item must be trimmed, bent, molded (with or without heat), or otherwise modified resulting in alterations beyond minimal self-adjustment." See Palmetto, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

190.    One of the key factors in identifying a "custom-fitted" orthotic is whether the item requires "minimal self-adjustment" or "substantial modification." Minimum self-adjustment, which for an off-the-shelf orthotic means adjustment that the "beneficiary, caretaker for the beneficiary, or supplier of the device can perform and that does not require the services of a certified orthotist (that is, an individual who is certified by the American Board for Certification

in Orthotics and Prosthetics, Inc., or by the Board for Orthotist/Prosthetist Certification) or an individual who has specialized training. For example, adjustment of straps and closures, bending or trimming for final fit or comfort (not all-inclusive) falls into this category." See Palmetto, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

191.    By contrast, a substantial modification, which is required for a custom-fitted orthotic, is defined as "changes made to achieve an individualized fit of the item that requires the expertise of a certified orthotist or an individual who has equivalent specialized training in the provision of orthotics such as a physician, treating practitioner, an occupational therapist, or physical therapist in compliance with all applicable Federal and State licensure and regulatory requirements. A certified orthotist is defined as an individual who is certified by the American Board for Certification in Orthotics and Prosthetics, Inc., or by the Board for Orthotist/Prosthetist Certification." See Palmetto, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

192.    As shown in the claims identified within Exhibits "1" – "4," Defendants often billed for Fraudulent Equipment that was purportedly "custom-fabricated" or "custom-fitted" for each Insured when – and to the extent that Fraudulent Equipment was actually provided – the items were never custom fabricated or fitted, as that term is defined by Palmetto.

193.    Based upon the prescriptions allegedly issued by the Referring Providers, Defendants each submitted numerous bills to GEICO for custom fabricated back braces under HCPCS Code L0632 which contained a charge for $1,150.00, custom fabricated back braces under HCPCS Code L0634 which contained a charge for $759.92, custom fabricated shoulder orthoses using HCPCS Code L3674 which contained a charge for $896.92, and customized knee orthoses

using HCPCS Code L1832 which contained a charge for $607.55.

194.    The products assigned to HCPCS Codes L0632, L0634, L3674, and L1832 are types of orthoses that are customized to fit a particular patient by an individual with expertise, not the prefabricated, off-the-shelf products that could be adjusted by the patients (by simply tightening the straps) and which were dispensed by Defendants.

195.    Instead, to the extent that Defendants provided any Fraudulent Equipment billed to GEICO as custom-fitted or custom-fabricated OD, including the charges for L0632, L0634, L3674, and L1832, the Fraudulent Equipment was provided without taking any action to custom-fabricate or custom-fit the OD to the Insureds. To the extent that Defendants attempted to make any adjustments to the DME received by Insureds identified in Exhibits "1" – "4," Defendants only provided minimal self-adjustment, as defined by Palmetto, which only supports charges for off-the-shelf items.

196.    In keeping with the fact that Defendants misrepresented that they custom-fabricated or fit OD purportedly provided to Insureds and billed to GEICO, the Paper Owner Defendants are not certified orthotists and did not complete sufficient training to become a certified orthotist.

197.    In addition to Defendants collectively submitting over a thousand charges that falsely represented the Defendants provided custom fabricated or custom fit OD, the Defendants also each submitted bills to GEICO using HCPCS codes that knowingly misrepresented the type of Fraudulent Equipment that was purportedly provided to the Insureds, to the extent that any DME actually was provided.

198.    The claims identified in Exhibits "1" - "4" for HCPCS Code E0272 are another example of how Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

199.    Each of the claims identified within Exhibits "1" - "4" for HCPCS Code E0272 contained a charge for $97.50 based upon prescriptions for an "Egg Crate Mattress."

200.    However, the product represented by HCPCS Code E0272 is defined as a foam rubber mattress, which is an actual full-size mattress, not a mattress topper or pad in the shape of an egg crate.

201.    Despite billing GEICO – and other New York automobile insurers – using HCPCS Code E0272, the items provided by Defendants – to the extent that Defendants provided the Insureds with any item – were not foam rubber mattresses as required by HCPCS Code E0272.

202.    By contrast, to the extent that any items were provided, they were mattress pads or toppers in the shape of egg crates, not an actual mattress. Mattress pads are Fee Schedule items listed under HCPCS Code E0199, which is defined as a "Dry pressure pad for mattress, standard mattress length and width."

203.    Unlike the fraudulent charges for $97.50 for each eggcrate mattress billed under HCPCS Code E0272 – and in keeping with the fact that the fraudulent charges were part of Defendants' common scheme to defraud GEICO and other automobile insurers – the Fee Schedule sets a maximum reimbursement rate of $19.48 for each mattress pad/topper billed under HCPCS Code E0199.

204.    In each of the claims identified within Exhibits "1" - "4" where Defendants billed for Fraudulent Equipment under HCPCS Code E0272, each of the bills fraudulently misrepresented that Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS Code E0272.

205.    The claims identified in Exhibits "1" – "7" for HCPCS Code E2611 are another example of how Defendants fraudulently misrepresented the Fee Schedule items purportedly

provided to Insureds – to the extent that any Fraudulent Equipment was actually provided – as part of their common scheme.

206.    Each of the claims identified within Exhibits "1" – "4" for HCPCS Code E2611 contained a charge for $282.40 based upon prescriptions for a "Cervical Pillow" or "Lumbar Pillow."

207.    However, the product represented by HCPCS Code E2611 is defined as a general use wheelchair cushion with a width of less than 22 inches.

208.    Despite billing GEICO – and other New York automobile insurers – using HCPCS Code E2611, the items provided by Defendants – to the extent that Defendants provided the Insureds with any item in response to the prescriptions for a lumbar cushion – were not cushions for use with a wheelchair.

209.    In keeping with the fact that the cushions provided to the Insureds were not for a wheelchair, virtually none of the Insureds identified in Exhibits "1" – "4" who were provided with a cushion by Defendants that was billed to GEICO under HCPCS Code E2611, were in a wheelchair

210.    By contrast, to the extent that any items were provided, the items were positioning cushions, which are Fee Schedule items listed under HCPCS Code E0190. HCPCS Code E0190 is defined as a "Positioning cushion/pillow/wedge, any shape or size, includes all components and accessories."

211.    Unlike the fraudulent charges for $282.40 for each lumbar cushion or cervical pillow billed under HCPCS Code E2611 – and in keeping with the fact that the fraudulent charges were part of Defendants' common scheme to defraud GEICO and other automobile insurers – the Fee Schedule sets a maximum reimbursement rate of $22.04 for each positioning cushion billed

under HCPCS Code E0190.

212.    In each of the claims identified within Exhibits "1" – "4" where Defendants billed for Fraudulent Equipment under HCPCS Code E2611, each of the bills fraudulently misrepresented that Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS Code E2611.

213.    The claims identified in Exhibits "1" – "4" for HCPCS Code T5001 are another example of how Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment actually was provided.

214.    Each of the claims identified within Exhibits "1" – "4" for HCPCS Code T5001 contained a charge of $265.00 based upon prescriptions for an "Orthopedic Car Seat."

215.    However, the product represented by HCPCS Code T5001 is defined as a positioning seat for persons (primarily children) with special orthopedic needs such as cerebral palsy, whose postural needs cannot be safely met by less costly alternatives such as the vehicle's restraint system or other restraint systems, and the person cannot use a standard/commercially available car seat.

216.     The following picture represents the type of car seat contemplated by HCPCS Code T5001:



217.     However, the orthopedic car seats purportedly provided by Defendants – to the extent that any items were provided – qualified as positioning cushions, which are Fee Schedule items listed under HCPCS Code E0190, defined as a "positioning cushion/pillow/wedge, any shape or size, includes all components and accessories," and having a maximum reimbursement rate of $22.04 per unit.

218.     The claims identified in Exhibits "1" - "4" for HCPCS Code E0274 are another example of how Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment actually was provided.

219.     Each of the claims identified within Exhibits "1" - "4" for HCPCS Code E0274 contained a charge for $101.85 based upon prescriptions for an "bed board."

220.     However, the product represented by HCPCS Code E0274 is defined as an over-bed table and is a table akin to those found in hospitals that permit a bed-bound individual the use of a table while confined to a bed.

221.    Despite billing GEICO – and other New York automobile insurers – using HCPCS Code E0274, the items provided by the Defendants – to the extent that the Defendants provided the Insureds with any item – were not over-bed tables as required by HCPCS Code E0274.

222.    By contrast, to the extent that any items were provided, they were bed boards, or large, flat pieces of cardboard that are placed under a mattress to make the mattress firmer and can keep the mattress from sinking. A bed board is listed under HCPCS Code E0273, which is a Non-Fee Schedule Item.

223.    In each of the claims identified within Exhibits "1" - "4" where the Defendants billed for Fraudulent Equipment under HCPCS Code E0274, each of the bills fraudulently misrepresented that the Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS Code E0274.

224.    As a Non-Fee Schedule Item, the reimbursement for HCPCS Code E0273 is the lesser of either 150% of the acquisition cost to the Defendants or the cost to the general public.

225.    Unlike the fraudulent charges for $101.85 for each bed board billed under HCPCS Code E0274, the maximum reimbursement rate Defendants were entitled to receive was significantly less.

226.    These are only representative examples. In the bills submitted to GEICO, and as shown in the charges identified in Exhibits "1" – "4" for Fee Schedule items, the Defendants regularly misrepresented the Fraudulent Equipment provided to the Insureds, to the extent that any Fraudulent Equipment was provided, in order to maximize the amount of No-Fault Benefits that they could obtain from GEICO.

   **2. The Defendants Fraudulently Misrepresented the Rate of Reimbursement for Non-Fee Schedule Items**

227.    As indicated above, under the No-Fault Laws, Non-Fee Schedule items are

reimbursable as the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the same item.

228.    By submitting bills to GEICO for Non-Fee Schedule items, Defendants each represented that they requested permissible reimbursement amounts that were calculated as the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the specific item.

229.    However, and as part of their common scheme and control by the Secret Owner, in virtually all of the charges to GEICO identified in Exhibits "1" - "4" for Non-Fee Schedule items, Defendants fraudulently represented to GEICO that the reimbursement sought was the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the same item.

230.    Instead, Defendants submitted bills to GEICO containing virtually identical charges that significantly inflated the permissible reimbursement amount of Non-Fee Schedule items in order to maximize the amount of No-Fault Benefits they were able to obtain from GEICO and other automobile insurers.

231.    The Defendants were able to perpetrate this scheme to fraudulently overcharge Non-Fee Schedule items by providing Insureds – to the extent they actually provided any Fraudulent Equipment – with low-cost and low-quality Fraudulent Equipment.

232.    When Defendants submitted bills to GEICO seeking No-Fault Benefits for Non-Fee Schedule items, the charges fraudulently represented 150% of Defendants' acquisition cost of purportedly high-quality items. In actuality, Defendants' legitimate acquisition cost for the low quality items was significantly less.

233.    In keeping with the fact that Defendants fraudulently represented the permissible reimbursement amounts in the bills submitted to GEICO for the Non-Fee Schedule items solely

for their financial benefit, Defendants purposefully attempted to conceal their effort to overcharge GEICO for Non-Fee Schedule items by never submitting a copy of their acquisition invoices in conjunction with their bills.

234.    The Defendants did not include invoices showing their legitimate cost to acquire the low-cost and low-quality Non-Fee Schedule items in the bills submitted to GEICO because the invoices would have shown that the permissible reimbursement amounts were significantly less than the charges contained in the bills.

235.    As part of their common scheme, the charges submitted to GEICO for Non-Fee Schedule items identified in Exhibits "1" - "4" virtually always misrepresented the permissible reimbursement amount.

236.    For example, Defendants each billed GEICO for infrared heat lamps under HCPCS Code E0205 with a charge of $325.00 per unit that was falsely represented as a permissible reimbursement amount for the Non-Fee Schedule item.

237.    Unlike the fraudulent charges for $325.00 submitted by Defendants under HCPCS Code E0205 for infrared heat lamps, the maximum reimbursement rate Defendants were entitled to receive was significantly less.

238.    The Defendants also each billed GEICO for EMS Units under HCPCS Code E1399 with a charge of $288.25 per unit that was falsely represented as a permissible reimbursement amount for the Non-Fee Schedule item.

239.    Unlike the fraudulent charges for $288.25 submitted by Defendants under HCPCS Code E1399 for EMS Units, the maximum reimbursement rate Defendants were entitled to receive was significantly less.

240.    The Defendants also each billed GEICO for massagers under HCPCS Code E1399

with a charge of $318.00 per unit that was falsely represented as a permissible reimbursement amount for the Non-Fee Schedule item.

241.    Unlike the fraudulent charges for $318.00 submitted by Defendants under HCPCS Code E1399 for massagers, the maximum reimbursement rate Defendants were entitled to receive was significantly less.

242.    The Defendants also each billed GEICO for whirlpools under HCPCS Code E1310 with a charge of $570.00 per unit that was falsely represented as a permissible reimbursement amount for the Non-Fee Schedule item.

243.    Unlike the fraudulent charges for $570.00 submitted by Defendants under HCPCS Code E1310 for whirlpools, the maximum reimbursement rate Defendants were entitled to receive was significantly less.

244.    These are only representative examples. In each of the claims identified within Exhibits "1" - "4" for Non-Fee Schedule items, each of Defendants fraudulently misrepresented in the bills submitted to GEICO that the charges were the lesser of 150% of the acquisition cost or the cost to the general public.

**F.    Defendants' Failure to Comply with Local Licensing Provisions**

245.    As stated above, for a DME/OD supplier to provide DME or OD to automobile accident victims within the City of New York, the DME/OD supplier must obtain a Dealer in Products License by the DCWP.

246.    For Defendants to lawfully provide DME to the Insureds identified in Exhibits "1" through "4," the DME Providers were required to obtain a Dealer in Products License because an overwhelming majority of the Insureds identified in Exhibits "1" through "4" were located within the City of New York.

247.    In addition to obtaining sufficient revenue from Insureds within the City of New York, the DME Providers were required to have a Dealer in Products license because the Fraudulent Equipment purportedly provided to Insureds fell within the definition of Products for the Disabled as defined under NYC Admin. Code § 20-425.

248.    However, LD Health Supply never ever obtained a Dealer in Products license issued by the DCWP.

249.    As a result, LD Health Supply was not ever eligible to collect No-Fault Benefits because they failed to comply with all local licensing requirements as they never obtained a Dealer in Products license issued by the DCWP.

250.    As part of Defendants' scheme to defraud GEICO and other Insurers, Defendants sought Dealer in Products Licenses from the DCWP in an effort to have the DME Providers appear to be legitimate.

251.    However, the DME Providers were not eligible to collect No-Fault Benefits from GEICO, and other automobile insurers, because they were never lawfully licensed by the DCWP to provide DME to Insureds.

252.    Further, Med Supply Delivery, Med Care Supply, and Rapid Supply were not lawfully licensed by the DCWP because they obtained Dealer in Products licenses through fraud and/or misrepresentations.

253.    As part of obtaining a Dealer in Products License, Dariabayeva, Assimkoanova, and Mateev completed license applications forms that required them to identify – among other things – all owners of Med Supply Delivery, Med Care Supply, and Rapid Supply.

254.    Each Dealer in Products License application contains an affirmation to be signed with a penalty for false statements under Section 175.35 of New York's Penal Law.

255.    However, Dariabayeva, Assimkoanova, and Mateev knowingly provided false information in the Dealer in Products License applications filed on behalf of Med Supply Delivery, Med Care Supply, and Rapid Supply respectively.

256.    Dariabayeva, Assimkoanova, and Mateev each affirmed on their license applications, under penalty for false statements, that they were the sole owner of their respective DME Provider.

257.    Dariabayeva, Assimkoanova, and Mateev knowingly provided false information regarding their ownership to induce the DCWP to issue licenses to them, which would give Defendants the appearance of legitimacy and provide them with the opportunity to submit fraudulent billing to GEICO and other Insurers through the DME Providers.

258.    In reality, as set forth above, the DME Providers, including Med Supply Delivery, Med Care Supply, and Rapid Supply, were actually controlled by the Secret Owner, who directly profited from the fraudulent scheme committed through these DME Providers.

259.    Dariabayeva, Assimkoanova, and Mateev knowingly provided false information regarding Med Supply Delivery, Med Care Supply, and Rapid Supply's ownership to induce the DCWP to issue a license to them, which would give Med Supply Delivery, Med Care Supply, and Rapid Supply the appearance of legitimacy and provide them with the opportunity to submit fraudulent billing to GEICO and other Insurers.

260.    Accordingly, Defendants were never entitled to receive No-Fault Benefits because they failed to comply with all significant statutory and regulatory requirements by operating as a DME supplier within the City of New York without a valid Dealer in Products License.

261.    In each of the claims identified in Exhibits "1" through "4," Defendants knowingly misrepresented that they were properly licensed with all local statutory and regulatory

requirements and were lawfully permitted to provide DME/OD to Insureds, when Defendants were never entitled to collect No-Fault Benefits in the first instance, because LD Health Supply failed to ever obtain Dealer in Products licenses and, in the case of Med Supply Delivery, Med Care Supply, and Rapid Supply, they did not lawfully obtain a Dealer in Products License because they received their Dealer in Products license under the false pretenses described above.

**G.    The Fraudulent Billing Defendants Submitted or Caused to be Submitted to GEICO**

262.    To support their fraudulent charges, Defendants systematically submitted or caused to be submitted hundreds of NF-3 forms or HCFA-1500 forms to GEICO through and in the names of the DME Providers, seeking payment for Fraudulent Equipment.

263.    The NF-3 forms or HCFA-1500 forms that Defendants submitted or caused to be submitted to GEICO were false and misleading in the following material respects:

(i)    The NF-3 forms, HCFA-1500 forms, and the prescriptions uniformly misrepresented to GEICO that the Defendants provided Fraudulent Equipment pursuant to legitimate prescriptions from licensed healthcare providers for reasonable and medically necessary DME and/or OD and therefore were entitled to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because, to the extent that the Defendants provided any Fraudulent Equipment, it was pursuant to a fraudulent scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols;

(ii)    The NF-3 forms, HCFA-1500 forms, and the prescriptions uniformly misrepresented to GEICO that the Defendants provided Fraudulent Equipment pursuant to legitimate prescriptions from licensed healthcare providers for reasonable and medically necessary DME and/or OD and therefore were entitled to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because, to the extent that the Defendants provided any Fraudulent Equipment, it was pursuant to a fraudulent scheme that included dispensing Fraudulent Equipment based on prescriptions secured through collusive arrangements with the John Doe Defendants, including prescriptions that were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures;

(iii)    The NF-3 forms, HCFA-1500 forms, and the prescriptions uniformly misrepresented to GEICO that the Defendants provided Fraudulent Equipment pursuant to legitimate prescriptions from licensed healthcare providers for reasonable and medically necessary DME and/or OD and therefore were entitled to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because, to the extent that the Defendants provided any Fraudulent Equipment, it was based on decisions made by laypersons, not based upon lawful prescriptions from licensed healthcare providers for medically necessary items;

(iv)    The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented to GEICO that the Defendants provided Fraudulent Equipment that directly corresponded to the HCPCS Codes contained within each form and therefore were entitled to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because – to the extent that the Defendants provided any Fraudulent Equipment to the Insureds – the Fraudulent Equipment often did not meet the specific requirements for the HCPCS Codes identified in the NF-3 forms and HCFA-1500 forms;

(v)    The NF-3 forms, HCFA-1500 forms, and treatment reports, prescriptions, and delivery receipts uniformly misrepresented to GEICO the reimbursement amount for the Non-Fee Schedule items provided to the Insureds, to the extent that the Defendants provided any Fraudulent Equipment, and therefore were entitled to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because – to the extent that the Defendants provided any Fraudulent Equipment to the Insureds – falsified the permissible reimbursement amounts for Fraudulent Equipment identified in the NF-3 forms and HCFA-1500 forms; and

(vi)    The NF-3 forms, HCFA-1500 forms, and prescriptions uniformly misrepresented to GEICO that Defendants provided Fraudulent Equipment while they were in compliance with all local licensing requirements. In fact, Defendants were not entitled to receive No-Fault Benefits because, to the extent that Defendants provided any Fraudulent Equipment, they were not properly licensed by the DCWP as they either failed to obtain and Dealer in Products license from the DCWP or falsified the information contained in their application for a Dealer for Products License.

## III.    <u>The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance</u>

264.    The Defendants legally and ethically are obligated to act honestly and with integrity in connection with the provision of DME and OD to Insureds, and their actual submission of charges to GEICO.

265.    To induce GEICO to promptly pay the charges for Fraudulent Equipment,

Defendants have gone to great lengths to systematically conceal their fraud.

266.    Specifically, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the provision of the Fraudulent Equipment was pursuant to a common insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known (i.e. the John Doe Defendants), without regard for genuine patient care.

267.    Additionally, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the provision of the Fraudulent Equipment was pursuant to an insurance fraud scheme, which included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols and secured through collusive arrangements, including prescriptions that contained photocopied or otherwise duplicated signatures.

268.    Defendants also knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were based upon decisions made by laypersons who did not have the legal authority to issue medically necessary DME/OD, and not by an actual healthcare provider's prescription for medically necessary DME/OD, in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

269.    In addition, the Defendants knowingly misrepresented and concealed facts to prevent GEICO from discovering that the HCPCS Codes for Fraudulent Equipment contained in the bills submitted by the Defendants to GEICO did not accurately reflect the type of Fraudulent Equipment purportedly provided to the insureds.

270.    The Defendants also knowingly misrepresented the permissible reimbursement amount of the Non-Fee Schedule items contained in the bills submitted by Defendants to GEICO

and did not include any invoices to support the charges in order to prevent GEICO from discovering that Non-Fee Schedule items were billed to GEICO for financial gain.

271.    Finally, the Defendants knowingly misrepresented that they were lawfully licensed by the City of New York as they never complied with regulations requiring the DME Providers to obtain a Dealer in Products License from the DCWP because the DME Providers were either never licensed by the DCWP or received a their license under false pretenses and concealed these misrepresentations in order to submit bills to GEICO and prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

272.    The Defendants operated their fraudulent scheme in a "quick hit" fashion designed to frustrate GEICO's efforts to identify fraud, shifting the billing from one DME Provider to the next over the course several months. The billing and supporting documentation submitted by Defendants, when viewed in isolation, did not reveal its fraudulent nature.

273.    The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

274.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $940,000.00 based upon the fraudulent charges representing payments voluntarily made by GEICO to Defendants in reliance on their submitted billing.

275.    Based upon Defendants' material misrepresentations and other affirmative acts to

conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
**Against Rapid Supply, LD Health Supply, Med Care Supply, and Med Supply Delivery
(Declaratory Judgment, 28 U.S.C. §§ 2201 and 2202)**

276.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

277.    There is an actual case in controversy between GEICO and Rapid Supply, LD Health Supply, Med Care Supply, and Med Supply Delivery regarding more than $470,000.00 in fraudulent billing that has been submitted to GEICO in the names of the DME Providers.

278.    The DME Providers have no right receive payment for any pending bills submitted to GEICO because the bills for Fraudulent Equipment were not based upon medical necessity but were instead submitted as part of an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known (i.e. the John Doe Defendants), without regard for genuine patient care.

279.    The DME Providers have no right to receive payment for any pending bills submitted to GEICO because the bills for Fraudulent Equipment were pursuant to an insurance fraud scheme, which included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols and prescriptions secured through collusive arrangements, including prescriptions that were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures.

280.    The DME Providers have no right to receive payment for any pending bills submitted to GEICO because the DME Providers purportedly provided Fraudulent Equipment as a result of decisions made by laypersons, not based upon prescriptions issued by healthcare providers who are licensed to issue such prescriptions.

281. The DME Providers have no right to receive payment for any pending bills submitted to GEICO because – to the extent the DME Providers actually provided any Fraudulent Equipment – the DME Providers fraudulently misrepresented the type of Fraudulent Equipment purportedly provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent the Fraudulent Equipment provided to the Insureds.

282. The DME Providers have no right to receive payment for any pending bills submitted to GEICO because – to the extent the DME Providers provided any Fraudulent Equipment – the DME Providers fraudulently misrepresented that the charges for Non-Fee Schedule items contained within the bills to GEICO were less than or equal to the maximum permissible reimbursement amount.

283. The DME Providers have no right to receive payment for any pending bills submitted to GEICO because they failed to comply with local licensing requirements and either did not obtain a Dealer in Products license from the DCWP or concealed the ownership interests of the Secret Owner in their applications for Dealer in Products Licenses, and thus, were not properly lawfully licensed by the DCWP as required by regulations from the City of New York.

284. Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of Rapid Supply, Med Care Supply, Med Supply Delivery, and LD Health Supply.

**SECOND CAUSE OF ACTION**
**Against the Paper Owner Defendants and John Doe Defendant "1"**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

285. GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

286.    Rapid Supply, LD Health Supply, Med Care Supply, and Med Supply Delivery together constitute an association-in-fact "enterprise" (the "DME Provider Enterprise"), as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

287.    The members of the DME Provider Enterprise are and have been associated through time, joined in purpose and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, Rapid Supply, LD Health Supply, Med Care Supply, and Med Supply Delivery are ostensibly independent businesses – with different names and tax identification numbers – that were used as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to GEICO and other New York automobile insurers.

288.    The DME Provider Enterprise operated under four separate names and tax identification numbers in order to limit the time period and volume of bills submitted under any individual name, in an attempt to avoid attracting the attention and scrutiny of GEICO and other insurers to the volume of billing and the pattern of fraudulent charges originating from any one business. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the DME Provider Enterprise acting singly or without the aid of each other.

289.    The DME Provider Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing, overseeing and coordinating many individuals who have been responsible for facilitating and performing a wide variety of administrative and ostensibly professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to GEICO and other insurers), by creating and maintaining patient files and other records, by recruiting and supervising personnel, by negotiating and executing various contracts and/or illegal verbal agreements, by maintaining the bookkeeping and

85

accounting functions necessary to manage the receipt and distribution of the insurance proceeds, and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

290.    The Paper Owner Defendants and John Doe Defendant "1" have each been employed by and/or associated with the DME Provider Enterprise.

291.    Paper Owner Defendants and John Doe Defendant "1" knowingly have conducted and/or participated, directly or indirectly, in the conduct of the DME Provider Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges seeking payments that the DME Provider Enterprise was not eligible to receive under the No-Fault Laws, because: (i) the bills submitted to GEICO for the provision Fraudulent Equipment were not based upon medical necessity but were instead submitted pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols; (ii) the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants and issued pursuant to predetermined protocols, including prescriptions that were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures; (iii) the Fraudulent Equipment was dispensed pursuant to decisions by laypersons who are not legally authorized to prescribe DME; (iv) to the extent the DME Providers actually provided any Fraudulent Equipment, the DME Providers each fraudulently misrepresented the type of Fraudulent Equipment purportedly provided to Insureds as the HCPCS

Codes identified in the bills did not accurately represent the Fraudulent Equipment provided to the Insureds; (v) to the extent the DME Providers actually provided any Fraudulent Equipment, the DME Providers fraudulently misrepresented that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount; and (vi) the DME Providers failed to comply with local licensing requirements as they either failed to obtain a Dealer in Products license from the DCWP or they knowingly falsified information on their applications for a Dealer in Products License. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibits "1" through "4."

292.    The DME Providers Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which the Paper Owner Defendants and John Doe Defendant "1" operated the DME Providers, inasmuch as the DME Providers never operated as a legitimate DME provider, never was entitled to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for the DME Providers to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Defendants continue to bill GEICO and other New York automobile insurers and attempt collection on the fraudulent billing submitted through the DME Providers to the present day.

293.    The DME Providers Enterprise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other New York

automobile insurers. These inherently unlawful acts are taken by the DME Providers Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

294.    GEICO has been injured in its business and property as a direct consequence of the above-described conduct in that it has paid at least $940,00.00 pursuant to the fraudulent bills submitted by Defendants through the DME Providers Enterprise.

295.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**THIRD CAUSE OF ACTION**
**Against the Paper Owner Defendants and the John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

296.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

297.    The DME Providers Enterprise is an association-in-fact "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

298.    The Paper Owner Defendants and the John Doe Defendants are employed by and/or associated with the DME Providers Enterprise.

299.    The Paper Owner Defendants and the John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the DME Providers Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that the DME Providers were not eligible to receive under the No-Fault Laws because: (i) the bills submitted to GEICO for the provision Fraudulent Equipment were not based upon medical necessity but were

instead submitted pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols; (ii) the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants and issued pursuant to predetermined protocols, including prescriptions that were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures; (iii) the Fraudulent Equipment was dispensed pursuant to decisions by laypersons who are not legally authorized to prescribe DME; (iv) to the extent the DME Providers actually provided any Fraudulent Equipment, the DME Providers each fraudulently misrepresented the type of Fraudulent Equipment purportedly provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent the Fraudulent Equipment provided to the Insureds; (v) to the extent the DME Providers actually provided any Fraudulent Equipment, the DME Providers fraudulently misrepresented that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount; and (vi) the DME Providers failed to comply with local licensing requirements as they either failed to obtain a Dealer in Products license from the DCWP or they knowingly falsified information on their applications for a Dealer in Products License. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibits "1" through "4."

300.    The Paper Owner Defendants and the John Doe Defendants knew of, agreed to and

acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

301.    GEICO has been injured in its business and property as a direct consequence of the above-described conduct in that it has paid at least $940,000.00 pursuant to the fraudulent bills submitted by Defendants through the DME Providers Enterprise.

302.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**LD Health Supply, Daribayeva, and John Doe Defendant "1"**
**(Common Law Fraud)**

303.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

304.    LD Health Supply, Daribayeva, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Equipment.

305.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the Fraudulent Equipment that was dispensed was for reasonable and medically necessary DME and/or OD when in fact it was dispensed pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, (ii) in every claim, that the Fraudulent Equipment dispensed was pursuant to a legitimate prescription from a licensed healthcare provider,

when in fact the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants and issued pursuant to predetermined protocols, including prescriptions that were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures; (iii) in many claims, that Fraudulent Equipment was issued based upon legitimate prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided, to the extent any Fraudulent Equipment was provided, pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (iv) in many claims, that Fraudulent Equipment provided to the Insureds accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when the Fraudulent Equipment provided, to the extent that any Fraudulent Equipment actually was provided, did not meet the requirements for the specific HCPCS Codes billed to GEICO; (v) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount; and (vi) the representation that LD Health Supply had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact LD Health Supply never obtained a Dealer in Products license. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1."

306.    LD Health Supply, Daribayeva, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through LD Health Supply that were not compensable under the No-Fault Laws.

307.    GEICO justifiably relied on these false and fraudulent representations and acts of

fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $175,000.00 pursuant to the fraudulent bills submitted by LD Health Supply, Daribayeva, and John Doe Defendant "1" through LD Health Supply.

308.    The extensive fraudulent conduct by LD Health Supply, Daribayeva, and John Doe Defendant "1" demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

309.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**Against LD Health Supply, Daribayeva, and John Doe Defendant "1"**
**(Unjust Enrichment)**

310.    GEICO incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

311.    As set forth above, LD Health Supply, Daribayeva, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

312.    When GEICO paid the bills and charges submitted by or on behalf of LD Health Supply for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

313.    LD Health Supply, Daribayeva, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit LD Health Supply, Daribayeva, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

314.    The retention of GEICO's payments by LD Health Supply, Daribayeva, and John Doe Defendant "1" violates fundamental principles of justice, equity and good conscience.

315.    By reason of the above, LD Health Supply, Daribayeva, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $175,000.00.

**SIXTH CAUSE OF ACTION**
**Against Rapid Supply, Mateev, and John Doe Defendant "1"**
**(Common Law Fraud)**

316.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

317.    Rapid Supply, Mateev, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

318.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the Fraudulent Equipment that was dispensed was for reasonable and medically necessary DME and/or OD when in fact it was dispensed pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, (ii) in every claim, that the Fraudulent Equipment dispensed was pursuant to a legitimate prescription from a licensed healthcare provider, when in fact the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants and issued pursuant to predetermined

protocols, including prescriptions that were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures; (iii) in many claims, that Fraudulent Equipment was issued based upon legitimate prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided, to the extent any Fraudulent Equipment was provided, pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (iv) in many claims, that Fraudulent Equipment provided to the Insureds accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when the Fraudulent Equipment provided, to the extent that any Fraudulent Equipment actually was provided, did not meet the requirements for the specific HCPCS Codes billed to GEICO; (v) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount; and (vi) the representation that Rapid Supply had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Rapid Supply was not lawfully licensed as Mateev knowingly falsified the ownership information for Rapid Supply on their application for a Dealer in Products license. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2."

319.    Rapid Supply, Mateev, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Rapid Supply that were not compensable under New York No-Fault insurance laws.

320.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by

reason of the above-described conduct in that it has paid at least $208,000.00 pursuant to the fraudulent bills submitted by Rapid Supply, Mateev, and John Doe Defendant "1" through Rapid Supply.

321.    Rapid Supply, Mateev, and John Doe Defendant "1" extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

322.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**SEVENTH CAUSE OF ACTION**
**Against Rapid Supply, Mateev, and John Doe Defendant "1"**
**(Unjust Enrichment)**

323.    GEICO incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

324.    As set forth above, Rapid Supply, Mateev, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

325.    When GEICO paid the bills and charges submitted by or on behalf of Rapid Supply for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

326.    Rapid Supply, Mateev, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Rapid Supply, Mateev, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

327.    The retention of GEICO's payments by Rapid Supply, Mateev, and John Doe

Defendant "1" violates fundamental principles of justice, equity and good conscience.

328.    By reason of the above, Rapid Supply, Mateev, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $208,000.00.

**EIGHTH CAUSE OF ACTION**
**Against Med Care Supply, Assimkoanova, and John Doe Defendant "1"**
**(Common Law Fraud)**

329.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

330.    Med Care Supply, Assimkoanova, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

331.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the Fraudulent Equipment that was dispensed was for reasonable and medically necessary DME and/or OD when in fact it was dispensed pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, (ii) in every claim, that the Fraudulent Equipment dispensed was pursuant to a legitimate prescription from a licensed healthcare provider, when in fact the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants and issued pursuant to predetermined protocols, including prescriptions that were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures; (iii) in many claims, that Fraudulent Equipment

was issued based upon legitimate prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided, to the extent any Fraudulent Equipment was provided, pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (iv) in many claims, that Fraudulent Equipment provided to the Insureds accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when the Fraudulent Equipment provided, to the extent that any Fraudulent Equipment actually was provided, did not meet the requirements for the specific HCPCS Codes billed to GEICO; (v) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount; and (vi) the representation that Med Care Supply had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Med Care Supply was not lawfully licensed as Assimkoanova knowingly falsified the ownership information for Med Care Supply on their application for a Dealer in Products license. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3."

332.    Med Care Supply, Assimkoanova, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Med Care Supply, Assimkoanova, that were not compensable under New York No-Fault insurance laws.

333.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $267,000.00 pursuant to the

fraudulent bills submitted by Med Care Supply, Assimkoanova, and John Doe Defendant "1" through Med Care Supply.

334.    Med Care Supply, Assimkoanova, and John Doe Defendant "1" extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

335.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## NINTH CAUSE OF ACTION
### Against Med Care Supply, Assimkoanova, and John Doe Defendant "1"
### (Unjust Enrichment)

336.    GEICO incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

337.    As set forth above, Med Care Supply, Assimkoanova, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

338.    When GEICO paid the bills and charges submitted by or on behalf of Med Care Supply for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

339.    Med Care Supply, Assimkoanova, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Med Care Supply, Assimkoanova, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

340.    The retention of GEICO's payments by Med Care Supply, Assimkoanova, and John Doe Defendant "1" violates fundamental principles of justice, equity and good conscience.

341.    By reason of the above, Med Care Supply, Assimkoanova, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $267,000.00.

## TENTH CAUSE OF ACTION
### Against Med Supply Delivery, Daribayeva, and John Doe Defendant "1"
### (Common Law Fraud)

342.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

343.    Med Supply Delivery, Daribayeva, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

344.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the Fraudulent Equipment that was dispensed was for reasonable and medically necessary DME and/or OD when in fact it was dispensed pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, (ii) in every claim, that the Fraudulent Equipment dispensed was pursuant to a legitimate prescription from a licensed healthcare provider, when in fact the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants and issued pursuant to predetermined protocols, including prescriptions that were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures; (iii) in many claims, that Fraudulent Equipment

was issued based upon legitimate prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided, to the extent any Fraudulent Equipment was provided, pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (iv) in many claims, that Fraudulent Equipment provided to the Insureds accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when the Fraudulent Equipment provided, to the extent that any Fraudulent Equipment actually was provided, did not meet the requirements for the specific HCPCS Codes billed to GEICO; (v) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount; and (vi) the representation that Med Supply Delivery had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Med Supply Delivery was not lawfully licensed as Daribayeva knowingly falsified the ownership information for Med Supply Delivery on their application for a Dealer in Products license. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4."

345.    Med Supply Delivery, Daribayeva, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Med Supply Delivery that were not compensable under New York No-Fault insurance laws.

346.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $288,000.00 pursuant to the

fraudulent bills submitted by Med Supply Delivery, Daribayeva, and John Doe Defendant "1" through Med Supply Delivery.

347.    Med Supply Delivery, Daribayeva, and John Doe Defendant "1" extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

348.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## ELEVENTH CAUSE OF ACTION
### Against Med Supply Delivery, Daribayeva, and John Doe Defendant "1"
### (Unjust Enrichment)

349.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

350.    As set forth above, Med Supply Delivery, Daribayeva, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

351.    When GEICO paid the bills and charges submitted by or on behalf of Med Supply Delivery for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

352.    Med Supply Delivery, Daribayeva, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Med Supply Delivery, Pelta, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

353.    The retention of GEICO's payments by Med Supply Delivery, Daribayeva, and John Doe Defendant "1" violates fundamental principles of justice, equity and good conscience.

354.    By reason of the above, Med Supply Delivery, Daribayeva, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $288,000.00.

## TWELFTH CAUSE OF ACTION
### Against the John Doe Defendants
### (Aiding and Abetting Fraud)

355.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

356.    The John Doe Defendants knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by the DME Providers, Paper Owner Defendants, and John Doe Defendant "1."

357.    The acts of the John Doe Defendants in furtherance of the fraudulent scheme included, among other things, knowingly engaging in collusive arrangements with the Defendants for the procurement of medically unnecessary prescriptions for Fraudulent Equipment issued pursuant to a pre-determined protocol to maximize profits without regard to patient care and routing those prescriptions directly to the DME Providers, Paper Owner Defendants, and John Doe Defendant "1" and bypassing the Insureds.

358.    The conduct of the John Doe Defendants in furtherance of the fraudulent scheme was significant and material. The conduct of the John Doe Defendants was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for the DME Providers, Paper Owner Defendants, and John Doe Defendant "1" to bill for Fraudulent Equipment and obtain payment from GEICO and other insurers.

359.    The John Doe Defendants aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to the DME Providers, Paper Owner Defendants, and

John Doe Defendant "1" for medically unnecessary Fraudulent Equipment because they sought to continue profiting through the fraudulent scheme.

360.    The conduct of the John Doe Defendants caused GEICO to pay more than $940,000.00 pursuant to the fraudulent bills submitted through the DME Providers.

361.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

362.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other further relief the Court deems just and proper.

## **JURY DEMAND**

363.    Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against LD Health Supply, Rapid Supply, Med Care Supply, and Med Supply Delivery for a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that LD Health Supply, Rapid Supply, Med Care Supply, and Med Supply Delivery have no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of action against the Paper Owner Defendants and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but more than $940,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.      On the Third Cause of Action against the Paper Owner Defendants and the John Doe Defendants for compensatory damages in favor of GEICO in an amount to be determined at trial but more than $940,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against LD Health Supply, Daribayeva, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $175,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.      On the Fifth Cause of Action against LD Health Supply, Daribayeva, and John Doe Defendant "1" for more than $175,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against Rapid Supply, Mateev, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $208,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

G.      On the Seventh Cause of Action against Rapid Supply, Mateev, and John Doe Defendant "1" for more than $208,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

H.      On the Eighth Cause of Action against Med Care Supply, Assimkoanova, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $267,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

I.       On the Ninth Cause of Action against Med Care Supply, Assimkoanova, and John Doe Defendant "1" for more than $267,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

J.       On the Tenth Cause of Action against Med Supply Delivery, Daribayeva, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $288,000.00 together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

K.       On the Eleventh Cause of Action against Med Supply Delivery, Daribayeva, and John Doe Defendant "1" for more than $288,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper; and

L.       On the Twelfth Cause of Action against the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $940,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper.

Dated: January 23, 2026
       Uniondale, New York

                                        RIVKIN RADLER LLP

                                        By: /s/ Barry I. Levy
                                             Barry I. Levy, Esq.
                                             Michael Vanunu, Esq.
                                             Philip P. Nash, Esq.
                                             Jaana Singh, Esq.
                                        926 RXR Plaza
                                        Uniondale, New York 11556
                                        (516) 357-3000

                                        *Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*